**SOUTHERN NATIONAL BANK OF HOUSTON, TEXAS, Plaintiff,**

v.

**TRI FINANCIAL CORPORATION, Defendant.**

**Civ. A. No. 66–H–664.**

United States District Court,
S. D. Texas,
Houston Division.

July 29, 1970.

Andrews, Kurth, Campbell & Jones, George H. Hagle, Houston, Tex., for plaintiff.

Dixie, Wolf & Hall, Chris Dixie, Dow, Cogburn & Friedman, Edmund L. Cogburn, Houston, Tex., for defendant.

## MEMORANDUM OPINION

NOEL, District Judge.

Plaintiff bank has sued defendant, a California corporation, for damages for alleged breach of contract and fraud in connection with an alleged agreement by defendant to purchase a certain promissory note from plaintiff for $600,000. Defendant contests this Court's jurisdiction over it and has raised numerous other defenses. Diversity jurisdiction

exists, the requisite amount being in controversy. 28 U.S.C. § 1332.

The following narrative is undisputed. Prior to April 13, 1964, Clayton Blakeway of Austin, Texas, Wilbur Clark of Las Vegas, Nevada, and William Ward of California became interested in the building of a new hotel in Austin and formed a Texas limited partnership for that purpose. Blakeway was able to obtain for the group an option on the proposed site. Plans were prepared. It was determined that the total cost of land and building for the project would be $3,300,000. Permanent financing for the project was sought from a group of banks and savings and loan associations located in Austin and San Antonio. This group, hereinafter referred to as the Austin lenders, issued a commitment letter to the three borrowers on April 13, 1964. Under its terms, Austin lenders agreed to provide borrowers $2,-700,000 for a term of twenty years to be secured by a first lien on the completed hotel.

The borrowers next approached plaintiff for interim construction financing. Plaintiff agreed to advance the $3,-300,000 required for the project if borrowers could obtain a commitment for the additional $600,000 in permanent financing required over and above the $2,700,000 committed by Austin lenders. William Ward, who was located in California, requested such a commitment from Hamilton Moody, the executive vice president and treasurer of defendant. On July 2, 1964, Moody sent a letter to Ward and an identical telegram to Blakeway in Dallas, Texas, committing defendant to lend $600,000 for a term of five years on the security of a second lien on the completed project. Ward acknowledged receipt of the commitment the same day, in a letter transmitting a $12,000 commitment fee.

Plaintiff decided to arrange the interim construction financing of the project on a "pre-closed" basis. Two promissory notes were prepared, each secured by a deed of trust and incorporating the terms which the respective permanent lenders had required in their commitments. The first lien note was for $2,-700,000 to be paid over 20 years. The second was in discount form, in the face amount of $780,000 to be paid over 5 years, the amount to be advanced being $600,000. Both notes were to be executed by the limited partnership and the three partners individually. At defendant's request, the second lien note was also to be executed by the three partners' wives. Both notes were payable to the order of plaintiff.

Two agreements to purchase the respective notes from plaintiff upon completion of the hotel were prepared. It was contemplated that plaintiff would execute a construction loan agreement, advance the construction money as required, and assume responsibility for the proper construction of the hotel. Upon completion of the hotel, tender by plaintiff of specified documents evidencing proper construction would obligate the permanent lenders to purchase their respective notes. Each note-purchase agreement recited that copies of such documents were attached thereto, and that the permanent lenders had examined them and approved their form. The term of the agreements was to be 18 months.

On August 4, 1964, representatives of all parties except defendant met in Austin to close the financing. The note-purchase agreements, notes, deeds of trust, and construction loan agreement were all executed as of that date. The agreement to purchase the second note had been signed by Moody a few days previously, and was returned by Ward to Austin to be executed by plaintiff and dated at the closing.

On August 27, 1965, during the term of the note-purchase agreements, Wilbur Clark died. His will was probated in Nevada, and his executors published notice of their appointment. On December 17, 1965, the statutory period for the filing of claims in the Nevada estate ended. Neither plaintiff nor defendant filed a claim before that date with reference to the note-purchase agreement be-

tween them. By statute, such failure barred prosecution of any such claim against the Nevada estate forever.

In the latter part of 1965 the three borrowers and the Austin lenders began to discuss extending the February 4, 1966, deadline for the funding of the permanent financing. After negotiations plaintiff agreed to delay funding of the first lien note to May 5, 1966, if the Austin lenders would approve the form of the closing documents on February 4. Similar negotiations with defendant failed when defendant refused to execute an extension agreement on the ground that certain fees due it from the borrowers remained unpaid.

In a letter dated January 20, 1966, plaintiff requested that defendant purchase the second lien note in Austin on January 31. The letter also stated that on that day plaintiff would tender to defendant the instruments and documents referred to in the note-purchase agreement. Such closing date was later extended to February 4, as permitted by the agreement.

Representatives of plaintiff were in Austin on February 4 to consummate the extension of the agreement to purchase the first lien note and to close or extend the agreement with defendant. No representative of defendant was present.

Counsel for plaintiff in Austin conferred on February 4 by telephone with counsel for defendant in San Diego in an effort to reach agreement on an extension of the note-purchase agreement. Agreement was not reached, and on the afternoon of February 4, 1966 plaintiff stated to defendant by telephone its tender of performance of all its obligations under the note-purchase agreement and demanded purchase by defendant. Such tender and demand were restated in telegrams sent to defendant late that afternoon.

Demand was again made by plaintiff upon defendant in letters dated March 10 and April 27, 1966. Defendant did not purchase the note and on May 2, 1966, informed plaintiff by letter that it would not honor plaintiff's requests that it do so.

The Austin lenders purchased the $2,700,000 first lien note from plaintiff as requested. The second lien note went into default, and after acceleration, demand, and posting, a foreclosure sale was held in accordance with the provisions of the deed of trust. The property was purchased by plaintiff at the sale for $315,000 subject to the first lien (which had also been accelerated) and was later sold to others for $400,000.

In this action plaintiff seeks recovery of the $200,000 deficiency sustained in foreclosure, as well as unliquidated damages consisting of the expense of foreclosure and of proceeding against the makers of the note. A further claim, for fraud, sounds in tort. As indicated, defendant has raised numerous technical defenses and has contested personal jurisdiction. Each defense will be considered chronologically, together with the facts and allegations on which it is based. The jurisdictional question will be discussed last, as it turns on all the facts and circumstances.

## I. LACK OF ASSENT

When Hamilton Moody signed the note-purchase agreement for defendant, the date of the agreement and the date 18 months later on which the agreement was to expire had not been inserted. Moreover, defendant alleges that of the documents referred to in the agreement and purportedly attached thereto, only the note and deed of trust were actually attached. Defendant asserts that it never saw the other documents, including the construction loan agreement, until after February 4, 1966, the agreement's termination date.

Defendant also alleges that when Ward brought the agreement without attachments to Moody to be executed, Moody signed and delivered it to Ward but made the delivery conditional upon receipt of the missing attachments and approval by defendant of the attach-

ments and the dates inserted. Defendant asserts that such condition was never fulfilled, and that the agreement is therefore void. In this connection, defendant asserts that Ward was acting as plaintiff's agent in bringing the agreement to Moody for execution.

■■ Thirdly, defendant alleges that it was never notified that plaintiff had executed the agreement, for which reason the agreement is void.[1]

Fourthly, defendant alleges fraud by plaintiff sufficient to void the agreement. The note-purchase agreement reflects that the advancement of all funds upon the notes would be governed by the terms of a "Construction Loan Agreement, a copy of which is attached hereto as Exhibit 'C' and which is incorporated herein by reference." Defendant asserts that by referring to the construction loan agreement as such but failing to transmit same to defendant, plaintiff represented that all funds to be advanced upon the notes would be used only for construction costs. Defendant asserts that this representation was false, $600,000 in fact having been used to purchase the land, that it was material, and that it therefore voids the agreement.

Finally, it is stipulated that Moody lacked explicit authority from defendant's board of directors to make the commitment of July 2, 1964, or to execute the note-purchase agreement. Defendant alleges that Moody lacked implied or apparent authority as well, for which reason his execution of the agreement failed to bind defendant.

Plaintiff contends that defendant has ratified Moody's execution of the agreement, and has waived, or is estopped to raise, the other alleged defects in the formation of the contract. Plaintiff also disputes many of the facts on which defendant relies and asserts that the alleged defects are not sufficient to void the contract. Not all of plaintiff's contentions will be discussed, it being clear that the contract is not void.

■ Defendant is now foreclosed from denying Moody's authority to bind it to the note-purchase agreement. It is clear from the Texas authorities that where a corporation has knowledge of a contract made in its name by one of its agents, receives and retains benefits from such contract despite opportunity to disaffirm and rescind it, and permits the other party to such contract to take action in reliance thereon, such corporation is bound by such contract by ratification, and may not avoid its obligations thereunder. *E. g.,* Republic National Bank of Dallas v. Whitten, 383 S.W.2d 207 (Tex.Civ.App.—Dallas 1964), aff'd, 397 S.W.2d 415 (Tex.1965); Almar-York Co. v. Fort Worth Nat. Bank, 374 S.W.2d 940 (Tex.Civ.App.—Fort Worth 1964, writ ref'd n. r. e.); Miller v. Sealy Oil Mill & Mfg. Co., 166 S.W. 1182 (Tex.Civ.App.—San Antonio 1914, no writ); Peach River Lumber Co. v. Ayers, 41 Tex.Civ.App. 334, 91 S.W. 387 (1906, writ ref'd); *cf.* Brown v. Grayson Enterprises, 401 S.W.2d 653 (Tex. Civ.App.—Dallas 1966, writ ref'd n. r. e.) (inadequate notice to board of directors). *See also,* Continental Assurance Co. v. Supreme Construction Corp., 375 F.2d 378 (5th Cir. 1967); Petition of Den Norske Amerikalinje A/S, 276 F. Supp. 163 (N.D.Ohio 1967); 2 W. M. Fletcher, Cyclopedia of the Law of Private Corporations § 466 (M. Wolf & E. Comisky ed. 1969).

■ Assuming arguendo that Moody lacked authority to bind defendant to the note-purchase agreement at the time he executed it, subsequent events have cured such defect and caused a ratification binding defendant to such agreement. Defendant received and retained a $12,000 commitment fee from the borrowers for making the commitment.

---

1. Such defense is specious. Moody testified that he did not deposit the check covering the commitment fee until he learned from Ward that the transaction had gone through. It is not necessary that the offeree personally notify the offeror of acceptance, so long as the latter learns from some source promptly.

Plaintiff advanced $3,300,000 on the two notes in reliance on defendant's commitment. Defendant's board of directors knew of the commitment on or before August 31, 1965, when defendant published its annual report for the year ending May 31, 1965, for a note to the financial statements therein made express reference to such commitment. Thereafter, if not before, defendant's board of directors knew or should have known that plaintiff was relying on defendant's commitment in advancing construction funds on the project.

Defendant argues, however, that "[a]t the time the Board of Directors * * * was put on notice of the execution of the note purchase agreement by Plaintiff and Hamilton Moody, there had been such a commitment by Plaintiff and the banks which had agreed to long-term commitments, that any action which might have been taken to disaffirm Defendant's liability would not have been successful in preventing a change of position by the Plaintiff which had taken place long ago." Conceding arguendo that plaintiff had begun relying on defendant's commitment a year before the board of directors learned of it, such reliance does not discharge defendant's duty to disaffirm. If anything, it intensifies that duty, for plaintiff deserved the opportunity to prevent its situation from becoming even more untenable. Plaintiff could have sought further security from the borrowers, required them to obtain a substitute permanent lender, or filed a claim with the Nevada estate of Wilbur Clark. Instead, defendant permitted plaintiff to continue looking primarily to it for the amounts advanced under the notes. Its failure to act after August 31, 1965, together with its retention of the commitment fee, bound it to the contract Moody had executed in its behalf. For this reason, it is unnecessary to determine how much prior to August 31, 1965, the board of directors knew or should have known of the commitment, or whether the retention of the fee alone would support a finding of ratification.

Defendant's remaining contentions will be considered together. In making them, defendant is asserting the rule recognized in Mattox v. Davis, 437 S.W. 2d 308, 310 (Tex.Civ.App.—El Paso 1969, no writ): "A general rule of contract law is that where any essential term of a contract is left open for future negotiations, there is no binding contract." It must be remembered, however, that "[a] transaction is complete when the parties mean it to be complete," 1 A. Corbin, Contracts § 29 (1963 ed.), and that "'[t]he determination that an agreement is sufficiently definite is favored,' * * * particularly * * * where one of the parties has performed his part of the contract,". Tanenbaum Textile Co. v. Sidran, 423 S.W.2d 635, 637 (Tex.Civ.App.—Dallas 1967, writ ref'd n. r. e.); *accord,* 1 Corbin, *supra* §§ 29, 95, 101.

The record here establishes that plaintiff and defendant left no essential term of the note-purchase agreement between them open for future negotiations and that they each assented to the agreement as expressed in the written contract with its attachments. Assuming arguendo that Moody never saw the construction loan agreement and the other documents defendant now claims were never furnished, defendant does not deny that Moody signed a document containing the following provision:

Permanent Lender has heretofore examined, and hereby approves, the form of the instruments or documents attached hereto as exhibits and agrees that delivery to it of said instruments or documents in such form duly executed by the party or parties required by the form thereof to execute said instruments or documents shall satisfy any condition or conditions to its obligations hereunder which relate to the execution or delivery of such instruments or documents.

In the face of this warranty and the general rule that a party who signs a contract intending to be bound but fails to read it is obligated according to its

terms,[2] *see, e. g.*, Thigpen v. Locke, 363 S.W.2d 247 (Tex.1962); Shaw Equip. Co. v. Hoople Jordan Const. Co., 428 S. W.2d 835 (Tex.Civ.App.—Dallas 1968, no writ); 3 A. Corbin, Contracts §§ 548, 607 (1960 ed.), defendant asserts that the conditional delivery to Ward prevented consummation of the contract. Such assertion requires more extended consideration.

In the first place, contrary to defendant's contention, Ward was not acting as plaintiff's agent when he handed the note-purchase agreement to Moody, obtained the latter's signature, and returned it to Austin. The heart of any agency relationship is "the manifestation of consent by one person to another that the other shall act on his behalf and subject to his control.   *   *   *" Restatement of Agency 2d, § 1. The Texas definition is similar:   "[A]n agent is one who undertakes to transact some business, or to manage some affair for another, by the authority and on account of   *   *   * it." Boyd v. Eikenberry, 132 Tex. 408, 122 S.W.2d 1045, 1047 (1939). Ward and the other members of the limited partnership were clearly acting in their own interest from the outset in their search for construction and permanent financing for the hotel. When they approached plaintiff, plaintiff indicated its willingness to provide $3,300,000 in construction financing if the borrowers could produce a commitment for the $600,000 in permanent financing not already committed by the Austin lenders. However, plaintiff did not commission the borrowers to seek this commitment in its behalf. Had it done so, an agency relationship might have arisen. Rather, plaintiff merely informed the borrowers that the production of such a commitment was a necessary predicate to the advancement of construction funds. It attempted to exercise no control over the borrowers, and the primary beneficiary of a successful search for construction financing would be the limited partnership. The structure of this transaction is similar to a surety arrangement. Ward was no more the agent of plaintiff in his efforts to obtain permanent financing than a borrower is the agent of a lender in the search for a guarantor.[3]

2. The cited rule applies to the construction loan agreement as well as to the other instruments referred to in the note-purchase agreement. On July 30, 1964, plaintiff sent several copies of a draft construction loan agreement to Blakeway in Austin. One such copy was for defendant. The note-purchase agreement which Moody signed had been sent in the same manner, to Blakeway for transmittal to defendant, only five days previously. Plaintiff had no notice that defendant's copy of the draft would not reach defendant prior to the closing date. As regards use of funds to be advanced, the draft sent defendant does not differ from the draft executed at the closing. More significantly, there was no fraud. By referring to the construction loan agreement in the note-purchase agreement, plaintiff represented only that the funds advanced would be used *in connection with* the construction of the hotel, as they were in fact used. It did not represent that the funds would be used *for* construction only.

3. In fact, if the record discloses any agency relationship, it was Ward acting as agent for defendant at the closing in Austin on August 4, 1964. Such relationship would have been an "implied agency," authority "inferred from prior habits or from a course of dealings of a similar nature between the parties, especially where the agent has repeatedly been permitted to perform similar acts in the past." 3 Am.Jur.2d Agency § 19. The agency relationship does not depend upon express appointment, but is frequently implied from the words and conduct of the parties. Panhandle Steel Erectors, Inc. v. Whitlow, 359 S.W.2d 146 (Tex.Civ.App.—Amarillo 1962, no writ).

From the first, defendant used Ward and Blakeway as a conduit in its dealings with plaintiff. It sent the original commitment letter to them, obtained the completed documents from them, and returned the final contract, after signature by Moody, via Ward. Its prior conduct initiated a course of conduct from which an agency could be inferred. Having thus authorized the partners to act as its intermediary, defendant justified plaintiff's reliance on its agent's authority, which is presumed to be coextensive

The surety cases also refute defendant's contention that delivery was conditional. "The law is well settled that a conditional delivery of a guarantee instrument must be brought home to the obligee in order to relieve a guarantor of his obligation expressed in the guaranty agreement which he has signed." Eastman Oil Well Survey Co. v. Hamil, 416 S.W.2d 597, 604 (Tex.Civ.App.—Houston 1967, writ ref'd n. r. e.); *accord*, Tarlton v. Trezevant & Cochran, 165 S.W.2d 514, 515 (Tex.Civ.App.—Dallas 1942, writ ref'd w. o. m.); Kugle v. Traders' State Bank, 252 S.W. 208 (Tex.Civ.App.—San Antonio 1923, no writ); Bopp v. Hansford, 18 Tex.Civ. App. 340, 45 S.W. 744 (1898, writ ref'd).

The resemblance between the note-purchase agreement at issue here and a surety arrangement is close. Just as a surety agrees to pick up an obligation under certain circumstances, so did defendant agree to pick up the construction loan after the project had been built. Just as the surety on a bond is usually compensated for his risk, so the partnership paid defendant a fee. Also, interestingly, just as a surety seldom really expects to have to stand up for the debtor, so did defendant not anticipate having to perform.[4] Finally, and most significantly, just as a lender often will lend only on the strength of a surety's undertaking, so plaintiff agreed to lend only after defendant's take-out commitment was obtained.

No case has been found in which a Texas court has extended the reasoning of the surety cases to enforce a note-purchase agreement like the one before this Court. However, in view of the striking similarity just mentioned, as well as plaintiff's reliance on defendant's undertaking, I am convinced that in an appropriate case a Texas court would disregard defendant's secret condition. Without knowledge that delivery was conditional, plaintiff is not bound by any condition. Defendant communicated the condition only to Ward. Whether Ward be considered defendant's own agent or merely a third-party intermediary, his failure to apprise plaintiff of the condition made the delivery unconditional. For this reason, it is unnecessary to determine whether breach of the condition was waived by defendant's failure to object promptly, or whether plaintiff's reliance estops defendant from objecting now.[5]

with the business entrusted to his care. United Federal Life Insurance Co. v. Cloud, 370 S.W.2d 147 (Tex.Civ.App.—Eastland 1963, no writ). Plaintiff knew that defendant had once before entrusted Ward to deliver the commitment letter and, in the absence of any indication to the contrary, plaintiff could assume that Ward was also authorized to deliver the executed note-purchase agreement, which was clear and complete on its face. Cf. Kugle v. Traders' State Bank, 252 S.W. 208, 209 (Tex.Civ.App.—San Antonio 1923, no writ). It is settled that an agent's acts within the scope of his apparent authority in dealing with innocent third persons will bind the principal for whom he acts, although the act may not be authorized or even is in violation of private instructions. San Angelo Water, Light & Power Co. v. Baugh, 270 S.W. 1101 (Tex.Civ.App.—Austin 1925, error dism'd). The failure of Ward, defendant's chosen instrumentality of transmittal, to apprise plaintiff of the conditional nature of defendant's offer, or to give notice that the instrument was being delivered conditionally, was a risk which should fall on defendant. This is the teaching of the "telegraph cases." See, e. g., Hulme v. Levis-Zuloski Mercantile Co., 149 S.W. 781 (Tex.Civ.App.—Amarillo 1912, no writ). Western Union Tel. Co. v. Chihuahua Exchange, 206 S.W. 364 (Tex.Civ.App.—El Paso 1918, no writ). See generally Simpson, Contracts § 30 (1954). However, a finding of agency is not necessary for the decision here. Defendant is bound whatever the nature of its relationship with Ward.

4. This subject is discussed in the next section of this Memorandum Opinion.

5. In the pretrial order in this case, defendant stated one of its contentions as follows: "The purported Note Purchase Agreement may not be proved except through resort to parol testimony which, under the terms of such agreement, is not permitted under the Texas Statute of Frauds, recovery being thereby barred thereon." Defendant has offered no evi-

## II. FRAUD BY DEFENDANT

In his letter of July 2, 1964, acknowledging receipt of defendant's commitment and transmitting the $12,000 commitment fee, Ward made the following assurance to Moody:

On behalf of myself and my two partners, Clayton E. Blakeway and Wilbur Clark, I guarantee that you will not have to perform in respect to this secondary financing commitment.

Moody testified by deposition that before he signed the July 2, 1964, commitment letter, he had the following conversation with defendant's president:

I told him Mr. Ward had called me and it looked like a chance to pick up around $12,000 in fees, and I told him —I had been assured we would never have to perform on it, so he said, "Are you sure you're never going to have to perform?" And I said, "I'm positive." So he said, "Well, why don't you go ahead."

Plaintiff contends that Moody's testimony establishes that his intention at the time he executed the commitment letter and the note-purchase agreement was never to perform under the agreement under any conditions, and that by executing the agreement with such intent, Moody (and through him by ratification, defendant) perpetrated a fraud upon plaintiff. I find that when Moody's testimony is considered in the light of his complete reliance upon the guarantee by Ward of a take-out by the borrowers, Moody's testimony does not establish fraud. As I construe his testimony, he was merely stating that in his calculated business judgment the risk that defendant would ever be called upon to perform under the note-purchase agreement was minimal. When he signed the note-purchase agreement, he did not contemplate being asked to perform under it. But this is not to say it was his deliberate intention to mislead plaintiff. I find that defendant did not commit a fraud upon plaintiff.

## III. RELEASE

[16–18] Defendant contends that plaintiff's failure to file a timely claim against the Nevada estate of Wilbur Clark constituted a release of one of the makers of the note in violation of the terms of the note-purchase agreement, one paragraph of which provided as follows:

Bank further agrees that during the term of this agreement it will not release any of the makers of the note nor release the lien of the Deed of Trust securing same, except to the extent that credits by Bank upon its loan evidenced by The Note and made as a result either of payments received thereon or of Bank's failure for any reason to advance the full sum of $600,000 upon The Note, may by operation of law constitute such a release or releases.

Defendant contends that such violation relieves it of any obligation to purchase the note.

At issue, of course, is the meaning of the term "release" as used in the agreement, a question of interpretation. Resolution of the question requires a consideration of all available evidence of

dence or argument in support of such contention, and although invited to submit proposed findings of fact and conclusions of law after trial, has submitted no proposal in connection therewith. I therefore find and conclude that such contention has been waived or abandoned. Alternatively, I find and conclude that defendant has failed to satisfy its burden of proving such contention, and that its defense based thereon is insufficient. The note-purchase agreement is not invalid by virtue of the Texas Statute of Frauds.

Similarly, in an amended pleading filed at the commencement of trial, defendant alleged, inter alia, that the note it had agreed to purchase was usurious, and that therefore the agreement to purchase same was unenforceable. No evidence, argument, authorities, or proposed finding or conclusion was offered in support of such allegation. Accordingly, I find and conclude that it also has been waived or abandoned, or in any event not proven.

the intent of the parties and all of the facts and circumstances surrounding their negotiations. Local Union No. 787, IUE v. Collins Radio Co., 317 F.2d 214, 220 (5th Cir. 1963). *See generally* 3 Corbin, *supra,* §§ 538, 543A–B (1960 ed. & Supp. 1964). For this reason, prior decisions by other courts construing and interpreting other contracts offer little assistance. Each case must rest on its own facts.

Before essaying interpretation of the contract, it is well to determine precisely what plaintiff's failure to file a claim did and did not accomplish. Such failure did not release Wilbur Clark; his death accomplished that. Nor did it release his estate from all liability; it merely caused the claim against the estate in Nevada to become barred. In fact, plaintiff was permitted to file a claim against Clark's California estate, which claim is still pending.

Thirdly, plaintiff's failure to file did not preclude defendant from filing a contingent claim based on the note and note-purchase agreement; defendant had the same right to file a claim in the Nevada proceedings that plaintiff had, for both potential claims were contingent, the note not then being in default. Thus what the failure to file actually did was to deprive defendant the opportunity to be subrogated to plaintiff's claim. Plaintiff did nothing to disparage defendant's rights to pursue the makers of the note. Its conduct was no more than a failure to engage in such pursuit itself.

In other paragraphs, the note-purchase agreement authorizes but does not require plaintiff to sell the note to defendant "without recourse upon [plaintiff], and without warranty, expressed or implied, as to the capacity or liability of any of the makers of The Note," and permits, but does not require plaintiff to exercise rights of collection and enforcement against defaulting makers of the note.

In view of these contractual provisions and the facts and circumstances surrounding execution of the contract, I am persuaded that the failure to file a claim in the Nevada proceedings did not constitute a "release" as that term was used in the note-purchase agreement between plaintiff and defendant. I find that by using that term the parties referred to the kind of act described by Justice Rutledge in McKenna v. Austin, 77 U.S.App.D.C. 228, 134 F.2d 659, 661 (1943):

> When one surrenders all means of enforcing his claim against another and does this in settlement of a dispute and threatened litigation, he effectually extinguishes the underlying right. Thereafter, if it is a right at all, it is a right without remedy. * * * [F]or the ordinary run of private rights and private litigation, the idea of right without remedy is hardly a working hypothesis. Everyday law is predicated upon the courts' capacity to do something about disputes. When one wholly surrenders his recourse to the courts in such matters, he insulates his adversary against his claim as effectually as when in so many words he releases him.

In the cited case the court held a "covenant not to sue" to be equivalent to a "release." Similarly, I do not believe that in using the word "release" in their note-purchase agreement plaintiff and defendant meant to restrict its scope to formal legal documents headed by the specific term. However, plaintiff's conduct bears little resemblance to a formal release. Its failure to act deprived defendant of nothing except a right of subrogation which would not arise until plaintiff filed the claim itself. Nor did such failure insulate Clark or his estate from liability on the note. Defendant's rights against both Clark and the estate were not affected by the failure to act. No right was extinguished; no right remained without any remedy at all. True, neither party had a remedy against the estate in Nevada. Yet both parties had remedies against the estate elsewhere. Most significantly, defendant's remedy against the estate in Nevada was not affected by plaintiff's failure

to act. That was barred irrespective of plaintiff's conduct by the absolute statutory bar.

Supplementing its "release" contention, defendant asserts that the failure to file constituted a failure to mitigate damages and caused a failure of consideration. The first suggestion is untenable. Defendant had neither breached nor indicated an intention so to do; having not yet been injured by any breach of defendant's, plaintiff had no damages to mitigate. Similarly, the consideration argument misses the mark. There was no failure of consideration because the note after claims in Nevada were barred was not utterly worthless. Defendant therefore is not entitled to rescission. Reed v. Buck, 370 S.W.2d 867, 874 (Tex.1963).

In sum, I find that plaintiff's failure to file a claim in Nevada breached no duty owed defendant. It is unnecessary to decide whether such failure caused defendant any injury.

### IV. TENDER

Under the terms of the note-purchase agreement defendant's obligation to purchase the note at plaintiff's request was "subject to the fulfillment of the following *conditions precedent on or prior to* the Closing Date, as hereinafter defined: * * *" (Emphasis added.) The "conditions precedent" were itemized as "tender or delivery" of various specified executed documents assigning the note to defendant and evidencing that the hotel had been completed in accordance with the plans and specifications and was subject to no prior liens except that securing the first lien note. The agreement further defined the "Closing Date" as

that date specified by [plaintiff] in its request to [defendant] to purchase The Note as the date which [defendant] shall be obligated to purchase The Note from [plaintiff], and pay [plaintiff] therefor, provided *the conditions precedent* to [defendant's] obligation *shall have been theretofore, or shall contemporaneously therewith be,*

*satisfied and performed,* * * *. (Emphasis added.)

Defendant contends that plaintiff's failure to seek it out and produce the specified documents in its presence made plaintiff's attempted tender ineffectual and prevented its obligation to purchase the note from arising. Plaintiff responds that its tender by telephone and telegram sufficed.

In Perry v. Little, 419 S.W.2d 198 (Tex.1967), the Texas Supreme Court was faced with a situation similar to the one now for decision. At issue was an agreement to purchase stock. On the first date performance could be required, the vendor wrote the vendee advising the latter of his readiness to perform. The vendee ignored the letter and several other demands to purchase. At trial the defense was improper tender. Citing many authorities the court held:

In our opinion a formal tender of the stock was not necessary. * * * The rule governing this case is expressed in 6 Williston on Contracts, (3d ed.) § 833:

"It is said that the strict rules of tender are not applicable to a conditional offer to perform a concurrent condition; that what is essential is that it shall appear to the court and shall have been made clear to the other party to the contract that the exchange agreed upon would be carried out immediately if the latter would do his part. This requirement involves both ability on the part of the plaintiff to perform and an indication of that ability to the other party. The actual production of the money or other thing which the plaintiff is to give is said to be unnecessary.

"As the courts have said 'the word "tender" as used in connection with such a transaction, does not mean the same thing as when used with reference to the offer to pay money where it is absolutely due, but only a readiness and willingness

to perform in case of the concurrent performance by the other party, with present ability to do so, and notice to the other party of such readiness.' "

Such rule also controls on the facts here. Although "tender or delivery" of the executed instruments were denominated "conditions precedent" in the note-purchase agreement, such agreement permitted them to be performed prior to or contemporaneously with defendant's purchase of the note. Moreover, the purpose of the tender by plaintiff was not merely to discharge its obligations under the agreement, but also to place defendant in default should defendant not likewise tender performance.

■■■■ The tender was sufficient. It is therefore unnecessary to consider plaintiff's contention that improper tender, if any, was waived.[6]

### V. REAL PARTY IN INTEREST

■■■ At the same time that the construction and permanent financing for the hotel was being arranged among plaintiff, defendant, the Austin lenders, and the borrowers, plaintiff independently entered into a participation arrangement with the First National Bank of Boston (First). Under this arrangement, First agreed to furnish a portion of the funds to be advanced by plaintiff for construction; as to that portion, plaintiff was only a conduit, the actual lender being First. Similarly, when the second lien note went into default and a loss was sustained at the foreclosure sale, First assumed and wrote off a portion of the loss.

This action against defendant for damages was brought only by plaintiff. First is not a party. Defendant claims that First should be joined as a "real party in interest" under Rule 17 or as an "indispensible party" under Rule 19, Fed.R.Civ.P.

Rule 17(a), Fed.R.Civ.P. provides that "Every action shall be prosecuted in the name of the real party in interest" but that "a party with whom or in whose name a contract has been made for the benefit of another * * * may sue in his own name without joining with him the party for whose benefit the action is brought; * * *." A final sentence, of considerable importance here, was added by amendment in 1966:

No action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed after objection for ratification of commencement of the action by, or joinder or substitution of, the real party in interest; and such ratification, joinder, or substitution shall have the same effect as if the action had been commenced in the name of the real party in interest.

Defendant contends (1) that the permissive part of Rule 17(a), which allows suit to be brought without joinder of a beneficiary, is available only where state law permits suit in the beneficiary's interest without such joinder; and (2) that under Texas law plaintiff would not be permitted to sue in a Texas court unless First was joined. Defendant also argues that allowing the suit to proceed without joinder of First subjects it to

6. In an amended pleading filed at the commencement of trial, defendant alleged, inter alia, that plaintiff failed to perform its part of the agreement. In this connection defendant alleged that the agreement required tender or delivery of the promissory note endorsed to the order of defendant, that such endorsement would have carried with it a warranty prescribed by statute to the effect that plaintiff had no knowledge of any facts impairing the validity or value of the note, and that plaintiff could not make such warranty because at that time no claim could be filed against the estate of Wilbur Clark in Nevada. Whatever the validity of this argument, and such is dubious, I find and conclude that it has been waived or abandoned, or in any event not proven. As in the case of the contentions discussed in note 5 supra, defendant offered no evidence, argument, authorities, or proposed finding of fact or conclusion of law in support of such argument. Plaintiff did not breach any implied warranty made defendant.

the risk of double liability and may result in a multiplicity of suits. This second branch of its argument is similar to an assertion that First is an indispensable party whose joinder is required by Rule 19.

Conceding that state law determines its right to sue without joinder, plaintiff contends that Texas law does not require joinder, but rather permits suit for the benefit of First by plaintiff alone. Alternatively, plaintiff invokes the saving provision adopted in 1966. Joinder is not necessary, plaintiff contends, because First has ratified the commencement of this action and has agreed to be bound by the judgment herein. In support of its position plaintiff has submitted a letter to the Court from First reading in part as follows:

> The First National Bank approves and ratifies the bringing of the action by Southern National Bank and will continue to look exclusively to Southern National Bank for collection of all amounts which may be recoverable, both for the benefit of Southern National Bank and for the benefit of The First National Bank since any rights this Bank possesses are solely derivative from the participation agreement we had with the Southern National Bank. Southern National Bank is fully authorized to prosecute this action for the benefit of The First National Bank.
>
> The First National Bank accordingly agrees that it will be bound by the final determination made in this case.

As will be seen, resolution of the ratification issue moots defendant's other contentions.

In recommending adoption of the amendment to Rule 17(a), the advisory committee on rules stated that the new sentence "is added simply in the interests of justice. In its origin the rule concerning the real party in interest was permissive in purpose: it was designed to allow an assignee to sue in his own name. That having been accomplished, the modern function of the rule in its negative aspect is simply to protect the defendant against a subsequent action by the party actually entitled to recover, and to insure generally that the judgment will have its proper effect as res judicata." 28 U.S.C.A. Rule 17, Cum. P.P. Notes, at 5.

As originally proposed in 1964, the amendment applied only to maritime claims. At that time the advisory committee stated:

> It has been traditional practice in admiralty for suits for salvage to be filed by the owner or master on behalf of all those potentially entitled to share in the award. The evident convenience of this procedure has led to its general acceptance although the judgment in such a case would not seem to give complete theoretical protection to the defendant. See 1 Benedict § 123; * * *. It is therefore reasonable to provide that in such cases the action may be commenced by a potentially interested party. The interests of the defendant are adequately protected if the real party in interest is made a party of record within a reasonable time after the objection is raised. Quoted in 7A J. Moore, Federal Practice ¶ .55[3], at 403 (1966).

Although the 1964 proposal expressly mentioned ratification, as did the 1966 one (its wording was not changed when it was made applicable to all cases in the version adopted in 1966), the 1964 note does not indicate why the mention was made. The only suggestion of the committee's intent is the reference to Benedict. There the treatise notes that ratification is a prerequisite in a salvage case if a person not a party to the salvage proceeding (e. g., a crewman) wishes to recover his share, and that a person who does not ratify can maintain a separate suit if he wishes.

The cases since the 1966 amendment became effective discussing ratification are rare. In a brief per curiam opinion, Urrutia Aviation Enterprises v. B. B. Burson & Assoc., 406 F.2d 769 (5th Cir. 1969), the Court of Appeals for the

Fifth Circuit held sufficient a ratification similar to that submitted here. *Cf.* Prather v. Neva Paperbacks, Inc., 410 F.2d 698, 700 (5th Cir. 1969). *See also* Crowder v. Gordons Transports, Inc., 387 F.2d 413 (8th Cir. 1967). Apparently the ratification device has been sparingly used. Its principal area of application would appear to comprise those cases where an insurance company has paid all or a portion of a claim and becomes subrogated to its insured's right of recovery. That many devices are employed in an effort to avoid naming the insurer as a party is evidenced by the cases collected in the three exhaustive annotations in 13 A.L.R.3d. The usual device seems to be a fictitious loan to the insured repayable only out of the proceeds of recovery. Most courts ignore the fiction and require joinder if required by local law. *See, e. g.,* City Stores Co. v. Lerner Shops of Dist. of Columbia, Inc., 133 U.S.App.D.C. 311, 410 F.2d 1010 (1969) (over the strong dissent of Judge (now Chief Justice) Burger, who, however, does not mention the possibility of ratification). In other cases, joinder has been required on the authority of pre-1966 law, no reference being made to the amendments of that year. *E. g.,* Pub. Serv. Co. v. Crane Co., 48 F.R.D. 424 (N.D.Okl.1969); Neal v. Trim-Master Corp., 48 F.R.D. 392 (N.D.Miss.1969). Thus the loan device is likely to be ineffectual to avoid the necessity of joinder. Moreover, being fictional, it can introduce severe complications to a fundamentally simple controversy. *See, e. g.,* American Dredging Co. v. Federal Ins. Co., 309 F. Supp. 425 (S.D.N.Y.1970). It therefore should be avoided.

A few courts have reached the just result intended by the advisory committee without resort either to the loan fiction or to ratification. Staten Island Rapid Transit Ry. v. S. T. G. Construction Co., 421 F.2d 53 (2d Cir. 1970) (holding that even in the absence of formal ratification, defendant was amply protected from any risk of double liability); United Fed. of Postal Clerks v. Watson, 133 U.S.App.D.C. 176, 409 F.2d 462, 470 (1969) (giving credence to "the limited purpose of the rule to protect defendants against a subsequent suit on a cause of action previously adjudicated with another plaintiff"); *cf.* Sharrock v. Perkins, 297 F.Supp. 1285 (W.D.Okl.1969). However, ratification as expressly permitted by amended Rule 17(a) would appear to be preferable, at least in most cases.

Certainly ratification is preferable here. Equally apparent is its sufficiency to protect defendant. It is inconceivable to this Court that should First sometime choose to sue defendant directly, defendant could not defend successfully by exhibiting the judgment in the instant suit and the letter submitted and filed in the record here. First has expressly agreed "that it will be bound by the final determination made in this case." A holding that this assertion will not suffice, but that instead First must go to the expense and inconvenience of engaging counsel and entering a formal appearance in this action, could not be reconciled with amended Rule 17(a), nor with the general mandate of Rule 1, F.R.Civ.P.

Of course, amended Rule 17(a) does not deprive a court of discretion to choose whether to require ratification, joinder, or substitution on appropriate motion. I find on the facts here, however, that defendant is fully protected by the ratification by First, and that joinder would be a useless formality. The request for joinder is therefore denied.

## VI. DAMAGES

Defendant raises two general objections to plaintiff's claim for damages for breach of contract. In the first place, prior to trial defendant moved for a stay pending the termination of other actions brought by plaintiff against the makers of the note and the estate of Wilbur Clark in an effort to recover the deficiency owing on the $600,000 note. Defendant argues that plaintiff has not proved its damages because it has not

shown how much of the deficiency it will not recover from the makers. Alternatively, it alleges that plaintiff's damages are not yet ascertainable for the same reason.

Defendant's second contention goes to plaintiff's claim for recovery of the expense of pursuing the makers of the note. Defendant contends that the amount of such expense has not been sufficiently established in that plaintiff has not shown all of the expenses claimed to have been incurred solely as a result of defendant's breach.

Assuming that defendant is bound by the note-purchase agreement, as this Court has found, the parties do not dispute the recoverability of the amounts claimed by plaintiff if such are properly established as damages. *See generally,* e. g., 5A Corbin, Contracts § 1037, at 234–36; §§ 1044, 1078 (1964 ed.). Their dispute turns on the propriety of determining damages now and on the adequacy of plaintiff's proof.

Defendant's motion to stay was denied prior to trial, and such action is now reaffirmed. I can find no established doctrine in the law which requires a party who has been damaged by another party's breach of contract to exhaust fully all areas and avenues of mitigation before proceeding against the party who breached the contract. In the present case, plaintiff advanced the $600,000 primarily, if not exclusively, in reliance upon defendant's agreement to purchase the note for $600,000. Had defendant not breached its agreement, collection of the note itself would have been the responsibility of defendant. Plaintiff has agreed to assign to defendant all of its rights against the makers to the extent of its recovery from defendant of the damages it seeks here. It would be unreasonable and inequitable not to put the parties as much as possible in the position they would have been in had defendant not breached its agreement to buy the note. Judgment here should not be stayed.

Nor is the assertion tenable that damages can not yet be ascertained. Except for the expense of pursuing the makers, plaintiff's damages are liquidated: it lost $200,000 in the foreclosure proceedings. Only the extent to which defendant ultimately will have to bear such loss is uncertain. Such uncertainty will not justify a stay. Finally, plaintiff's expense to date of trial in pursuing the makers is as ascertainable as any other unliquidated sum. Stay of judgment will be denied.[7]

Plaintiff offered considerable testimony at trial to establish that it had sustained a loss of $200,000 on the note in the foreclosure proceedings and in support of its claim for attorneys' fees incurred in pursuing the makers of the note. The dispute over certainty revolves over plaintiff's effort to establish what portion of the fees incurred was attributable to defendant's breach, and what portion was attributable to other causes.

7. In its amended pleading filed at the commencement of trial, defendant alleged, inter alia, that because plaintiff had filed an identical action in the United States District Court in Southern California, and defendant had filed suit in the nature of an interpleader in California, this cause should be stayed pending the outcome of the California suits because California is a more appropriate forum. As in the case of several of its other defenses, see notes 5, 6, supra, defendant made no real effort to establish its right to a stay in proceedings prior to trial or at trial itself. There has been no convincing showing that the pendency of several actions works oppression on defendant. In fact, there has been no showing that the California suits are not in limbo pending resolution of this one. For this reason, this Court would be justified in finding and concluding that this aspect of defendant's request for a stay has been waived or abandoned. However, such is not necessary here, for it is apparent that defendant has failed to make the convincing showing required before a court may interfere with a plaintiff's choice of forum. Plaintiff had the right to bring this action in this Court. Except upon a convincing showing of extraordinary circumstances subjecting defendant to consequences much more serious than the usual expenses of litigation, this Court has no warrant to interfere with plaintiff's choice.

The standard of proof required to submit the question of damages to the trier of fact was expounded only recently by the Texas Supreme Court in Bildon Farms, Inc. v. Ward County Water Improvement Dist. No. 2, 415 S.W.2d 890, 896–897 (Tex.1967):

> All that the law requires is that the best evidence of which a case is susceptible be produced, and if from such evidence the amount of damages caused by the defendant can be inferred or estimated with reasonable certainty, then the amount of such damages is for the jury.[8]

Professor Corbin was of a similar view:

> The amount of an expenditure caused by the defendant's breach can usually be proved with a high degree of certainty. There are some cases, however, in which the experience of mankind is convincing that a substantial pecuniary loss has occurred, but, at the same time, it is of such a character that the amount of the loss in terms of money is not capable of proof with any high degree of certainty. In these cases the uncertainty of proof is not permitted to prevent the recovery of substantial compensation. The amount to be awarded is left to the discretion of the jury, subject to the usual supervisory power of the court. The plaintiff's evidence being the best that is available in such cases, the jury may use it as a basis of inference.
>
> * * * If the defendant's breach is one that, in the usual course of things, causes a substantial pecuniary loss of such a character that its amount cannot be proved, compensatory damages are recoverable in the reasonable discretion of the jury. If the loss is of such a kind that its amount can, in the ordinary course of things, be proved with reasonable certainty, substantial damages will be refused unless such evidence is given. 5A Corbin, *supra*, § 1021, at 132, 133–134.[9]

Recognizing the difficulty of establishing the damage caused it by virtue of the time its officers and employees devoted to the proceedings against the makers, plaintiff sought only the recovery of attorneys' fees. The difficulty in proving the latter arose from the fact that at the same time plaintiff was pursuing the makers and the estate of Wilbur Clark in connection with the note defendant did not purchase, it was engaged in other unrelated litigation against the same persons and pursuing another unrelated claim against the estate of Wilbur Clark. In this situation, any allocation of expense between claims arising from defendant's breach and the unrelated matters of necessity is to a considerable extent arbitrary. Defendant objects to such arbitrariness, and contends that plaintiff may recover only such damages from it as have been established to be attributable to its breach.

Upon consideration of the record and the evidence offered by plaintiff to prove its damages, I find and conclude that plaintiff has introduced the best evidence of which this case is susceptible. I further find and conclude that from such evidence the amount of dam-

---

8. See also, e. g., Donaldson v. Liberty Sign Co., 425 S.W.2d 901 (Tex.Civ.App. —Fort Worth 1968, writ ref'd n. r. e.)

9. Cf. id. at 135:
   The extent of the discretion given to trial judge and jury in determining the amount to be awarded as compensatory damages varies, not only with respect to the difficulty of proof caused by the defendant's breach, but also with respect to the degree of moral obliquity exhibited by the defendant in the character and circumstances of his breach. While the general rule is against the award of punitive damages in contract cases, there are some recognized exceptions. If the breach is "wilful" and the defendant can justly be charged with malice or avarice in refusing to perform his contract, it is believed that a larger verdict will be sustained than as against one who was unfortunate rather than "wilful" and who acted honestly and in good faith. In both cases, however, the damages are called compensatory, not punitive.

ages caused by defendant can be inferred with reasonable certainty, and that such amount equals $43,018.40 in expenses reasonably incurred as a foreseeable consequence of defendant's breach, plus $200,000 in loss sustained in connection with the foreclosure proceedings as a foreseeable consequence of defendant's breach.

## VII.  JURISDICTION

■ Defendant was served in this action under the provisions of the Texas long-arm statute, Tex.Rev.Civ.Stat.Ann. art. 2031b. Rule 4(e), Fed.R.Civ.P. requires that the adequacy of service be tested against the Texas statute. This test, however, reduces to due process, for the long arm of Texas has as great a reach as due process permits. Atwood Hatcheries v. Heisdorf & Nelson Farms, 357 F.2d 847 (5th Cir. 1966).

The decisions of the Supreme Court expounding the meaning of due process where personal jurisdiction is at issue have frequently been discussed. *E. g.*, *Electro-Craft Corp. v. Maxwell Electronics Corp.*, 417 F.2d 365 (8th Cir. 1969); *Southern Mach. Co. v. Mohasco Indus., Inc.*, 401 F.2d 374 (6th Cir. 1968); *Atwood, supra;* Hearne v. Dow-Badische Chem. Co., 224 F.Supp. 90 (S.D.Tex. 1963). Such discussion will not be repeated here.[10]

This opinion will be restricted to a statement of the tests distilled in *Mohasco, supra*, 401 F.2d at 381; *see id.* at n. 17, and an application of those tests to the facts and circumstances here.

Did defendant purposefully avail itself of the privilege of acting in Texas or causing a consequence there? Did the cause of action arise from such activities? Do such activities "have a substantial enough connection with the forum state [Texas] to make the exercise of jurisdiction over the defendant reasonable"? On the facts here, all three questions must be answered affirmatively.

The consequence purposefully caused in Texas by defendant was the construction of the hotel in Austin. Moody knew at the time he gave the commitment that the financing would not be consummated and the hotel would not be built except in reliance on the undertaking he gave. It is immaterial whether any representative of defendant ever set foot in Texas in furtherance of the transaction.

The other questions may be answered with equal alacrity. Plaintiff's cause of action arises solely from defendant's purposeful causation of Texas consequences. Finally, Texas has a great interest in assuring the existence of a remedy for damages incurred largely in judicial proceedings within its courts, as a consequence of reliance wholly in Texas on the obligation breached by defendant. Defendant's assumption and breach of its obligation to plaintiff have a connection with Texas much more substantial than their connection with any other state. The motion to dismiss must be denied. This Court has jurisdiction over defendant.

## VIII.  CONCLUSION

In sum, this Court has both personal and subject matter jurisdiction. Plaintiff is entitled to recover $243,018.40 in damages for breach of contract, but defendant is not liable in tort for fraud. Costs will be assessed against defendant.

10. But for the fact that the opinions of higher courts are replete with tests weighing contacts and assessing the interests of the forum state, my examination of the results reached in such cases (as opposed to the reasoning in the opinions) would persuade me that the filing of a motion to dismiss for want of personal jurisdiction in a federal court is futile. A federal court can hear a case only if to do so comports with "the convenience of parties and witnesses and [is] in the interest of justice." 28 U.S.C. § 1404(a). Surely such a limitation satisfies due process. However, because higher courts have not so simplified the law, and because the parties have briefed a motion to dismiss instead of a motion to transfer, I will address the due process considerations developed by the Supreme Court in personal jurisdiction cases.

All facts set out in this Memorandum Opinion, to the extent that they may be relevant to the disposition of the issues expressly resolved herein, are hereby found to be facts for the purposes of such disposition. Such finding, however, is not intended to be and is not a finding of any fact concerning any issue not expressly resolved. Similarly, the foregoing constitutes conclusions of law with respect to such issues resolved, to the extent it may be relevant to their disposition.

Within 15 days plaintiff will submit a proposed form of judgment consistent with the views expressed in this Memorandum Opinion, approved by defendant as to form.

The Clerk will file this Memorandum Opinion and send copies to counsel.