**BILDON FARMS, INC., Petitioner,**

**v.**

**WARD COUNTY WATER IMPROVEMENT DIST. NO. 2, Respondent.**

**No. A–11371.**

Supreme Court of Texas.

May 31, 1967.

Rehearing Denied June 28, 1967.

A. R. Archer, Jr., Monahans, Garland Casebier, Midland, for petitioner.

Johnson & Dionne, Hart Johnson, Fort Stockton, L. Holt Magee, Monahans, for respondent.

SMITH, Justice.

Bildon Farms, Inc., brought this suit against Ward County Water Improvement District No. 2 for damages allegedly caused by the District's breach of its contract to furnish water from Red Bluff Reservoir for irrigation purposes. The case was tried to a jury. The jury in answer to a special issue [1] found that the District delivered to Bildon Farms water of a higher saline quality than contemplated under the terms of the contract and that such water originated from sources other than Red Bluff Reservoir.[2] The jury also found in answer to Special Issues 2 and 3 that such delivery was negligence and a proximate cause of damages to Bildon Farms' growing crops.

---

[1] "SPECIAL ISSUE NO. 1

"Do you find from a preponderance of the evidence that the Defendant Ward County Water Improvement District No. 2 during a period between July 28th and August 9th, 1961, delivered into Bildon Farms, Inc.'s ditches, water of higher saline quality than Red Bluff Reservoir water from sources other than waters from Red Bluff Reservoir?

"Answer 'Yes' or 'No'
ANSWER: *Yes*

"SPECIAL ISSUE NO. 2

"Do you find from a preponderance of the evidence that the delivery of such water, if you have so found, was a proximate cause of the damages, if any, to the grain crop of Bildon Farms, Inc.?

"Answer 'Yes' or 'No'
ANSWER: *Yes*

"SPECIAL ISSUE NO. 3

"Do you find from a preponderance of the evidence that such delivery of water *for* such period, if you have so found, was negligence?

"Answer 'Yes' or 'No'
ANSWER: *Yes*"

[2] Bildon Farms alleged that the water to be furnished was to be procured from the Red Bluff Water Power Control District.

In answer to other issues,[3] the jury found that Bildon Farms suffered damages in the sum of $23,349.88, but that 30% of such damages to its growing crops was proximately caused by Bildon Farms' poor husbandry. The jury also found that Bildon Farms failed to farm the premises in keeping with good husbandry.[4]

The trial court accepted the verdict. Both parties filed motions for judgment. Bildon Farms' motion for judgment was based on the verdict. It made no request to the court to disregard the finding of the jury that 30% of the damages was caused by its poor husbandry.

The Water District filed a motion for judgment on the verdict. This motion was based on the finding of the jury that 30% of the total damages found by the jury was caused by Bildon Farms' poor husbandry. The Water District's position being that the finding amounted in law to a finding of contributory negligence and as a consequence thereof the only proper judgment to be entered was one that Bildon Farms take nothing by its suit. The Water District also filed a motion for judgment non obstante veredicto. This motion will be discussed later in this opinion. The trial court granted Bildon Farms' motion for judgment and overruled the motions for judgment filed by the Water District. Judgment was entered for $16,344.81, which was 70% of the damages suffered. On appeal, the Court of Civil Appeals sustained the Water District's contention that it was entitled to judgment

that Bildon Farms take nothing on the ground that the finding of the jury in answer to Special Issue No. 7 was a finding of contributory negligence which precluded Bildon Farms from a recovery of damages. Based on this holding, the intermediate court reversed the judgment of the trial court and rendered judgment that Bildon Farms take nothing by its suit. The intermediate court did not pass upon the points before it complaining of the action of the trial court in failing to grant the Water District's motion for judgment non obstante veredicto. Tex.Civ.App., 399 S.W.2d 373.

Bildon Farms has appealed from this adverse take nothing judgment and confines its points in this Court to the alleged error of the Court of Civil Appeals in rendering judgment in favor of Water District on the grounds that Bildon Farms was guilty of contributory negligence. We have concluded that the judgment of the Court of Civil Appeals based upon its holding that Bildon Farms was guilty of contributory negligence cannot be upheld, but will first dispose of the Water District's points presented in the Court of Civil Appeals which would, if sustained, require an affirmance of the judgment of that court.

In order to better understand our decision, we deem it necessary to state in some detail, the status and relationship of the parties, the terms of the contract between the parties, the pleadings, and the evidence bearing upon the basic issue to be decided in this case.

3.      "SPECIAL ISSUE NO. 6

"From a preponderance of the evidence, what damages, if any, were suffered by Bildon Farms, Inc., to the 1961 grain crop?
"Answer in Dollars and Cents, if any, or 'None'
    ANSWER: $23,349.88
      "SPECIAL ISSUE NO. 7
"What, from a preponderance of the evidence, do you find the damages, if any, to said crop was proximately caused by:
"A: Water of inferior quality to Red Bluff Reservoir from other sources, if any;

"B: Poor husbandry, if any;
"Answer in percentages of 100 if any, as to each, if any.
    "ANSWER:
    "A: 70%
    "B: 30%"

4.      "SPECIAL ISSUE NO 4
"Do you find from * * * the evidence that Bildon Farms, Inc., failed to farm the premises in question in keeping with good husbandry at the time and place involved?"
The jury answered 'Yes'."

### Ward County Improvement District

The Respondent, Ward County Water Improvement District No. 2, hereinafter referred to as the Water District, was established pursuant to the provisions of Chapter 86 of the General Laws of the Thirty-Fifth Legislature (1917), as amended (Acts 1919, 36th Leg., 2d C.S., p. 65, ch. 28), and these legislative enactments are now found in Article 7622 [5] et seq. In 1934 the Water District and six other water districts similarly situated along the Pecos River entered into a contract designated as the Master Contract, creating Red Bluff Water Power Control District and assigning to said master district all of the District's water rights in the Pecos River. The Red Bluff District was designated as a master district including within its boundaries the seven other subdistricts. Under the terms of the Master Contract, the Red Bluff District agreed to construct a reservoir on the Pecos River approximately ten miles south of the Texas-New Mexico line and to operate said reservoir so as to store the water of the Pecos River belonging to the subdistricts. When notified of the need for the water, Red Bluff would distribute the requested water to the subdistricts by conveying such water down the Pecos River to the headgate of the requesting subdistrict. After the water entered the system of the requesting subdistrict, it was responsible for getting the necessary irrigating water to the farmers of its district. Red Bluff District was originally a party defendant in this suit, but was dismissed therefrom and is not involved in this appeal.

### Bildon Farms

During 1961, the time material to this suit, Bildon Farms was the lessee of a 600-acre tract of land situated within the confines of the District upon which petitioner desired to plant and harvest a crop of milo maize. Because it is necessary to irrigate in order to produce crops in this arid section of the State, Mr. Joe Boswell, president and stockholder of Bildon Farms, Inc., contacted the Grandfalls office of the Water District in April, 1961, with regard to the availability of sufficient irrigation water for that year. Boswell testified that he was assured of a plentiful supply of water to be delivered at proper times, but, that notice would be required to the Water District office several days in advance of the need for the water "because they had to deliver the water from Red Bluff Dam to this District, and then to our farms." Such notice did not have to be written; only a telephone call or visit to the office was required. Boswell testified that when the contract was being discussed with representatives of the Water District that he and the employees of the Water District were "talking about" *Red Bluff water*; and he estimated Bildon Farms would need, during 1961, 1600 acre-feet of water for its 600 acres of milo maize, for which he paid $4,400 in cash in advance, plus a $2,000 credit to the account of petitioner's predecessor on the farm.

### Pleadings

Bildon Farms pleaded that it entered into a contract about April 1, 1961, whereby the District agreed to deliver at least 1,640 acre-feet of Red Bluff Reservoir water and at times requested by Bildon Farms; that under the contract the Water District agreed to deliver to Bildon Farms water it was to procure from *Red Bluff Reservoir* as needed to make a crop. Bildon Farms alleged that the contract was breached in that it delivered water from sources other than Red Bluff Reservoir; and that it failed to respond to the plaintiff's request for water when needed, although "there was adequate water stored in Red Bluff Reservoir to meet the needs of plaintiff and the other users of water in defendant district."

Bildon Farms also alleged certain acts of negligence on the part of the Water District. Although the trial court ruled that the negligence theory only was to be sub-

5. All references to statutes are to Vernon's Texas Civil Statutes unless otherwise indicated.

mitted to the jury, it is our view that Issue No. 1 and related issues embraced the breach of contract theory as well. We construe the pleadings to allege a claim for damages arising out of a breach of contract for the failure to furnish the Red Bluff Reservoir water contracted for at the times requested and for breach of contract for furnishing water from a source other than Red Bluff Reservoir. Therefore, disposition of the negligence issues is unnecessary to our decision.

### Evidence

The Water District presented points in the Court of Civil Appeals attacking the judgment of the trial court on the ground that there was no evidence to show that the Water District delivered inferior water to Bildon Farms and that there was no evidence in the record to establish that the water which was delivered proximately caused damages to Bildon Farms' crops. We have carefully considered the statement of facts consisting of 776 pages of testimony. In the interest of brevity, we shall not attempt to detail the evidence at length, but will summarize the evidence. We have discarded all adverse evidence and have given credit to all evidence favorable to Bildon Farms. In accordance with well settled rules of law, we have viewed the evidence from the standpoint of Bildon Farms, and have concluded that the evidence supports the findings under attack. The evidence showed that Bildon Farms had 600 acres of land under lease for the purpose of growing milo maize; that this land was divided into blocks as shown by a plat of the land which was introduced in evidence. The evidence reflects that some of the blocks were marked "salt". This indicated the tracts or blocks which were affected by the salt water or inferior water during the period of time from July 25th or July 28th to August 8th or 10th. Evidence showed that tracts "T,", "R" and "P" were not irrigated during the critical period involved; that in addition to tracts "T", "R" and "P", tracts "B", "F" and "G" and the west half of "H" consisting of 171 acres were not irrigated with salt water. These tracts produced 685,000 pounds of grain. The remaining 429 acres, which was irrigated during the critical period produced only 207,100 pounds of grain. The same preparations of the land for farming and the same type of husbandry were exercised. The crops which received the water from the Water District during the critical period first "fired" or "burned" and later died because of the excess salt water. This occurred during the period inquired about in Special Issue No. 1. The evidence is, depending upon the composition of the soil, that excessive salt in the water will cause the soil to "turn white and in some cases it will turn black." According to the evidence such changes in the color of the ground occurred. One witness testified that he had been engaged in irrigation and farming for many years; that he checked the soil on Bildon Farms for the year 1961 and found it to be "good"; that he checked the water in Red Bluff Reservoir and it was suitable for irrigation purposes. This witness testified in detail as to the farming methods used and the particular manner of planting "Northrup-King" maize. He testified that he examined the ground and the crop during the critical period and that "about the 6th of August, I noticed that this first field that I had put this water [salt] on began to what we call 'fire'. It began to show signs of dying, turning brown and leaves turning brown;" that the "ground at that time was beginning to show white, showing a salt condition;" that the ground had not looked "that way to that extent previous to that time." As heretofore pointed out, the jury found that Bildon Farms suffered damages to its 1961 grain crop in the sum of $23,349.88. The evidence supports such finding. The evidence shows that during the critical period the Water District delivered to Bildon Farms irrigation water of higher saline quality than Red Bluff Reservoir water. In 1952, this Court had for decision the case of Pickens v. Harrison, 151 Tex. 562, 252 S.W.2d 575. That case was a suit for damages to a rice crop alleged to have been caused by underground salt water. We upheld a jury

finding of damages upon facts similar in many respects to the facts in the present case.

In addition to the evidence hereinabove related, the testimony shows that the water flowing in the Pecos River contained a higher proportion of dissolved salts and other minerals than the water impounded in Red Bluff Reservoir. While the salinity of the water in Red Bluff Reservoir during July, 1961, was 6,310 parts salt per million parts water and in August, 1961, 6,700 parts salt per million parts water, yet the evidence shows that the salinity of Red Bluff Reservoir water was not of such degree as to render the water impounded in the reservoir unsuitable for irrigation purposes. The testimony shows that the Water District did not furnish Red Bluff Reservoir water to Bildon Farms in accordance with the terms of the contract. A witness testified that the character of water delivered during the critical period was principally *base flow* and *accretionary* water in the Pecos River rather than *Red Bluff Reservoir* water. His testimony follows:

"Well, the hydrograph would indicate between *July the 22nd* and *July the 25th* that the water being delivered through Brush Dam was undoubtedly *Red Bluff water* with whatever small *accretionary* water might be available at that time, but it was principally *Red Bluff water* delivered out of the reservoir.

"The hydrograph would indicate to me that beginning on *July the 25th and extending through to the early part or early morning hours of August the 7th,* there was no Red Bluff water being delivered through the Brush Dam weir or turnout. This was based upon the fact that the water, the amount of water being taken up by the constituent Districts above Brush Dam account for all of the water being delivered out of Red Bluff plus some additional increments which I believe to be accretionary waters because the ratio of total water being delivered out of Red Bluff and the total amount being used by the upper Districts is a little bit too large, or too small, rather to account for the seepage losses in the canal. At least there is no evidence that there was any excess water from Red Bluff available to go through the canal during this period from July the 25th to August the 7th. *From August the 7th on, obviously the water is reservoir water. I don't think there's any doubt about that. In my judgment, the water being delivered on, I believe July the 29th, from that point on to August the 7th is base flow in the River, accretionary waters * * * and by that, I mean waters added to the River from other sources, spring flow, return flow from irrigation operations, tail water being discharged from upper irrigation operations, return waters from bank storage in the River itself and in the canal, this being the water that would be stored back in the banks of the channels itself during higher stages of water in the River which would drain out as the water recedes and the water level recedes in the River itself, the bank storage water will drain out. It is a combination of all of the normal sources of water plus the return to irrigation water from the District above or the Districts above."* [Emphasis added.]

▇ We now turn to consider two other questions which must be answered. The questions are closely related and will be dealt with together. The first question is whether the findings of the jury in answer to Special Issues 4 and 5 to the effect that Bildon Farms' failure to farm the land in question in keeping with good husbandry was a proximate cause of the damages sustained precludes a recovery of the damages as found by the jury. The Court of Civil Appeals, as above indicated, held that these particular findings amounted to a finding of contributory negligence and upon that finding rendered its judgment that Bildon Farms take nothing by its suit. We do not agree with such holding; hence, the next question is whether there is some evidence to support the findings of the jury in answer to Special Issue No. 7, supra, that

the Water District caused 70% of the loss and Bildon Farms 30% thereof. This question was before the Court of Civil Appeals and was left undecided by that court. On the questions of negligence and contributory negligence, we simply hold that this being a suit for damages for breach of contract to furnish Red Bluff water, negligence is not in the case. While it is true that the pleadings allege and the evidence indicates that the Water District negligently breached its contract, we hold that the questions of negligence and contributory negligence are immaterial. Thus, the findings of the jury on such issues cannot operate to defeat Bildon Farms' recovery of damages.

▮ The Water District argues that as a matter of law Bildon Farms is bound by the terms of the Master Contract, supra, especially the provisions that "each of the seven parties thereto other than Red Bluff District" combined "its water appropriations and water rights by assigning same to the Red Bluff District" and the provision in Section 4 of the Master Contract which provides that water to be "possessed, controlled and distributed by the Red Bluff District includes all water impounded in and passing through its reservoirs and all water flowing in the Pecos River from said reservoirs down said river to the intake of party hereto. * * *" It is argued that since the Water District owned all of the waters of the Pecos River above its intake canal and below that of its nearest neighbor district upstream from it, and since the Water District conveyed all rights in such water to the Red Bluff District, "that district owned all of the water in the Pecos River, and the water from the Pecos River which appellant [Water District] delivered to appellee, [Bildon Farms] was as a matter of law water obtained by appellant from Red Bluff District." In taking this position, the Water District assumes that no contractual relationship exists between it and Bildon Farms and based on this assumption, it argues that there was no warranty, either express or implied, of the irrigation water it

furnished Bildon Farms. We cannot agree with these contentions. We reiterate that the record in this case clearly establishes a contract between the parties, as above outlined, and the evidence shows a breach of such contract. This issue was submitted to the jury and there can be no question but that Special Issue No. 1 adequately distinguished "other water" from "reservoir water." The fact that the Water District executed the Master Contract which includes all water in the Pecos River as well as that in the reservoir did not prevent the Water District from entering into a valid contract to limit the water to be delivered to that of Red Bluff Reservoir water.

▮ The Water District argues that, even if contributory negligence is not in the case, there is no evidence to support the jury's answer to Special Issue No. 7 that the Water District caused 70% of the loss and Bildon Farms 30% thereof. This argument is grounded upon the theory that the burden was on Bildon Farms to separate with mathematical certainty the exact amount of damages caused by each party. We disagree with this contention. We also disagree with the holding of the Court of Civil Appeals that Issue No. 7, as submitted, called for the application of the doctrine of comparative negligence. The issue simply called upon the jury to apportion the damages. The rule announced in the case of Powell Salt Water Co. v. Bigham, 69 S. W.2d 788 (Tex.Civ.App.1934, no writ hist.), although declared in a suit for damages against joint tort-feasors, is equally applicable in the present case. In that case it was held:

"It is true that the evidence does not establish to a mathematical certainty the exact amount of damages caused by appellant alone, nor does it separate with exact accuracy the damages caused by appellant from that caused by others who discharged salt water into the creek in question; but the law does not require such exactness. Where the evidence establishes that a plaintiff has suffered sub-

stantial damages, he is not to be denied a recovery merely because others than the defendant contributed to bring about his loss and he is unable to show distinctly the amount of damages contributed by each tort-feasor. All that the law requires is that the best evidence of which a case is susceptible be produced, and if from such evidence the amount of damages caused by the defendant can be inferred or estimated by the jury with reasonable certainty, then the amount of such damages is for the jury. 17 C.J. 758, 759; 13 Tex.Jur. 368; Owens v. Navarro County Imp. Dist. (Com.App.) 115 Tex. 263, 280 S.W. 532, par. 5; Burr's Ferry v. Allen (Tex.Civ.App.) 164 S.W. 878; Fort Worth & D. C. Ry. Co. v. Tomson (Tex.Civ.App.) 250 S.W. 747, par. 5."

Having disposed of all of the controlling questions presented in the Court of Civil Appeals and this Court, we reverse the judgment of the Court of Civil Appeals and affirm that of the trial court.