SOUTHERN NATIONAL BANK OF
HOUSTON, Houston, Texas,
Plaintiff-Appellee,

v.

CRATEO, INC., formerly known as Tri
Financial Corporation, Defendant-
Appellant.

No. 71-1248.

United States Court of Appeals,
Fifth Circuit.

March 29, 1972.

Rehearing Denied April 19, 1972.

Edmund L. Cogburn, Chris Dixie, Houston, Tex., Dow, Cogburn & Friedman, Dixie, Wolf & Hall, Houston, Tex., for defendant-appellant.

George H. Hagle, Houston, Tex., Andrews, Kurth, Campbell & Jones, Houston, Tex., for plaintiff-appellee.

Before RIVES, BELL and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

Southern National Bank (plaintiff-appellee) and Crateo (defendant-appellant) allegedly entered into an enforceable contract requiring Crateo to purchase, upon timely tender from Southern, a certain negotiable note. When Crateo refused to make that purchase, Southern fore-

closed on the security for the note, allegedly suffering $200,000 in liquidated damages, represented by the difference between the contract price of $600,000 and the $400,000 realized on foreclosure. Additionally, Southern purportedly incurred some $43,000 in attorneys' fees. Asserting diversity jurisdiction, Southern sued in the United States District Court for the Southern District of Texas. The district judge, sitting without a jury, awarded Southern the entire $243,000 plus an appropriate amount of interest. From that decision, Crateo appeals.

In early 1964, Blakeway, Ward and Clark, none of whom are parties to this action, formed a limited partnership under Texas law (Blakeway-Ward Enterprises) whose purpose was to construct the Crest Hotel in Austin, Texas. The projected cost of the project was $3,300,000. Interim financing was sought from Southern National Bank. It is a general practice for the interim financier, and one here followed by Southern, to negotiate a "take-out" agreement with one or more long-term lenders. Such an agreement requires that, on completion of the building in accordance with the original specifications, the long-term lender purchase the borrower's note from the short-term lender.

Blakeway-Ward Enterprises obtained a commitment from one long-term lender, the Austin Group, in the amount of $2,700,000 and another from Crateo (defendant-appellee) in the amount of $600,000. Southern and the Austin Group executed a contract effectuating the take-out arrangement between them, which agreement was pre-closed and entered into on August 4, 1964, and was performed on February 4, 1966 (exactly 18 months after closing). As part of the consideration, the Austin Group received, after purchasing the note, a first lien on the completed hotel.

Also on August 4, 1964, a similar agreement was purportedly pre-closed and entered into between Southern and Crateo, but with Crateo to receive a second lien on taking out Southern. When Southern demanded performance on

February 4, 1966, Crateo refused. As a consequence, Southern foreclosed on the hotel, paid off the Austin Group's first lien, and netted $400,000.

The issues raised on appeal are:

I. Whether the district court erred in finding personal jurisdiction over Crateo under the Texas "long-arm" statute.

II. Whether the district court erred in finding that an enforceable contract existed between Southern and Crateo.

III. Whether the district court erred in denying relief to Crateo since Southern had failed timely to claim an interest in the estate of one of the borrowers (Mr. Clark) who had since died.

IV. Whether the district court erred in denying relief to Crateo since Southern had allegedly not complied with the contractual provisions relating to tender of performance as a condition precedent to Crateo's obligation thereunder.

V. Whether the district court erred in awarding special damages for attorneys' fees on the facts here presented.

We find that the district court was correct in concluding that it had personal jurisdiction over Crateo. The reasoning in support of that conclusion is amply set out in the district court's opinion. Southern National Bank v. Tri Financial Corp., S.D.Tex.1970, 317 F. Supp. 1173, 1191.

### The Contract

Mr. Ward, upon Southern's request that a commitment for permanent financing be had, sought out Mr. Moody, executive vice-president and treasurer of Crateo. On July 2, 1964, Moody sent letters and telegrams to the same effect to Ward and to Blakeway committing Crateo to lend $600,000 for 5 years on the security of a second lien on the completed hotel. Ward acknowledged receipt of the commitment that same day, in a letter transmitting a $12,000 commitment fee to Crateo. A note

representing those terms was executed by Blakeway-Ward Enterprises, as maker, payable to Southern.

In customary course Southern would execute a construction loan agreement, advance the construction money as required, and assume responsibility for the proper construction of the hotel. Upon completion of the hotel, tender by Southern of specified documents evidencing proper construction would obligate Crateo to purchase the note for $600,000. A letter agreement (hereinafter "note-purchase agreement") was drafted by Southern's attorneys reciting that copies of such documents were attached thereto. The agreement was to be performed within 18 months. Said agreement was sent to Blakeway. Blakeway forwarded it to Ward who in turn delivered it to Moody. A few days prior to August 4, 1964, the date of closing, Moody signed the letter portion of the note-purchase agreement and returned it to Ward. At the actual closing in Austin, Texas, on August 4, no representative of Crateo appeared.

On February 4, 1966, after negotiations for an extension of the note-purchase agreement fell through,[1] Southern attempted to tender the required documents to Crateo and demanded payment thereon. Counsel for Southern in Texas conferred with counsel for Crateo in California by phone in an effort to reach a conciliation whereby Crateo would perform. The parties could not reach an accord, and on that same day Southern stated its tender and demand of performance by phone. Such tender and demand were restated in telegrams to Crateo late that afternoon. Crateo refused to purchase the note, and after

several subsequent demands Southern foreclosed on the hotel.

Both at trial and in this appeal Crateo contended that there was no contract in the legal sense between itself and Southern owing, *inter alia*, to the following allegations:

(1) Southern's attorneys prepared the note-purchase agreement consisting of a letter portion which recited that it had six exhibits, marked "A" through "F,"[2] attached and incorporated by reference;

(2) Southern's attorneys forwarded the letter portion minus the exhibits, except the note, Exhibit "A," to Blakeway-Ward Enterprises in Austin, not to Crateo; and

(3) Mr. Kuhlman, an officer of Southern, admitted by letter that Moody had signed the agreement although one of the exhibits, the Construction Loan Agreement (Exhibit "C"), had not yet been prepared.

Despite the above enumerated allegations, the district judge concluded that an enforceable contract existed. Noting that a contract is unenforceable where any essential term is left open to future negotiations, he concluded that "no essential term of the note-purchase agreement between them [had been left] open \* \* \*." 317 F.Supp. at 1180. The district court reasoned that even assuming Moody never saw part of the agreement, he signed a document which included the following clause:

"[Crateo] has heretofore examined, and hereby approves, the form of the instruments or documents attached hereto as exhibits and agrees that delivery to it of said instruments or documents in such form duly executed by the party or parties required by

---

1. February 4, 1966, was the last day that Southern could exercise its option to compel Crateo to perform under the note-purchase agreement.

2. Exhibit "A" was to be a promissory note made by Blakeway-Ward Enterprises payable to Southern.

    Exhibit "B" was to be a copy of the deed of trust.

    Exhibit "C" was to be a copy of the construction loan agreement.

    Exhibit "D" was to be a copy of the plans and specifications of the hotel to be built.

    Exhibit "E" was to be the certificate of completion.

    Exhibit "F" was to be the subordination agreement.

the form thereof to execute said instruments or documents shall satisfy any condition or conditions to its obligations hereunder which relate to the execution or delivery of such instruments or documents."

On the authority of that clause, the district judge held that "a party who signs a contract intending to be bound but [who] fails to read it is obligated according to its terms, *see, e. g.,* Thigpen v. Locke, 363 S.W.2d 247 (Tex.1962); Shaw Equip. Co. v. Hoople Jordan Const. Co., 428 S.W.2d 835 (Tex.Civ.App.— Dallas 1968, no writ); 3 A. Corbin, Contracts §§ 548, 607 (1960 ed), . . . . " (Footnote omitted.) Id. at 1180–1181.

On its face the letter agreement signed by Crateo, even without the attachments, purports to be a contract. In fact the letter portion of the agreement contains all the necessary elements of a valid, enforceable contract, and to the extent disclosed therein it should be enforced.

In trying to avoid liability under the contract here at issue, Crateo is asserting the defense of mistake of fact. The Texas Supreme Court has defined the defense aptly: It is " 'an unconscious ignorance or forgetfulness of the existence or nonexistence of a fact, past or present, material to the contract.' " Houston & T. C. R. Co. v. McCarty, 1901, 94 Tex. 298, 302, 60 S.W. 429, 431, quoting Pomeroy, Equity Jurisprudence § 839. In attempting to bring itself within this definition, Crateo contends, for example, that had it known the hotel was being totally financed (that the borrowers were not investing any money whatsoever) it would not have entered into the "take-out" agreement with Southern. The terms of the financing arrangements between Southern and the borrowers were disclosed in one of the attachments which Crateo did not see. Crateo avers that, because the documents were not affixed, it was ignorant or mistaken as to the nature of the borrowers' involvement and as to other material facts. Thus, says Crateo, the contract is without legal effect.

■ However, the defense of mistake of fact has certain well-recognized exceptions. In determining whether the doctrine or its exceptions are applicable to the present case, this Court is bound by the principles enunciated in *Erie* to apply Texas law. As a general rule in Texas and in other jurisdictions, a mistake by one party to an agreement, where it is not induced by acts of the other party, will not constitute grounds for relief. Morris v. Millers Mutual Fire Insurance Co., Tex.Civ.App.1961, 343 S.W. 2d 269; Keystone Pipe & Supply Co. v. Kleeden, Tex.Civ.App.1927, 299 S.W. 671; Price v. Biggs, Tex.Civ.App.1919, 217 S.W. 236. The question thus becomes whether Crateo's mistake or ignorance as to the facts disclosed in the unseen attachments was "induced" by Southern. Crateo's ignorance could be said to have been induced by Southern if the latter misrepresented the facts, if it acted in less than good faith, or if it had notice of Crateo's ignorance. *E. g.,* 17 Am.Jr. 2d, Contracts § 146. The record on appeal does not support a finding that Southern was guilty either of misrepresenting the facts or of acting in other than good faith.

However, Southern did know that Crateo had not been apprised of all the attendant facts. Such notice can be inferred from Southern's failure to forward Crateo the attachments here at issue. Does that notice on the part of Southern render the contract unenforceable? We think not. Although there is much case support for the precept that the validity of the contract becomes doubtful where a mistake of fact by one party is known to the other, those cases are not here apposite. One cannot stop the inquiry with asking whether Southern had knowledge of Crateo's ignorance. Other legal principles come to bear.

■ Although the facts of which Crateo had no knowledge could be said to be "material" insofar as most businessmen would be concerned, it cannot be said that such facts were material to the contract as a matter of law. Ordinarily, facts are material only when the parties

consider them to be. Here, Crateo was aware of the existence of documents containing important information, but it made no effort to examine those documents. As one court noted, where parties enter into a contract despite their conscious ignorance of certain facts, it seems clear that they have concluded that the existence or nonexistence of these particular facts is of no consequence to them and would not influence or induce them to refrain from entering into the contract, whatever they may turn out to be. Harley v. Magnolia Petroleum Co., 1941, 378 Ill. 19, 37 N.E.2d 760. Hamilton Moody, in signing the contract on behalf of Crateo, exhibited that same attitude of indifference. He chose to rely on a promise from Mr. Ward that Crateo would not have to perform [3] rather than to investigate the substance of the contract for himself. The applicability of the doctrine of mistake is limited to situations in which the party asserting the defense is unconsciously ignorant or mistaken as to the questioned fact. Here, Crateo was conscious and purposeful in its ignorance. Crateo was on notice of the existence of important attachments, owing to the letter agreement's specific reference to the missing exhibits, and should have sought out their content. Accordingly, even if the unknown facts were material, Crateo cannot be allowed to assert the defense of mistake.

Crateo's failure to investigate brings a third point to the fore. Texas law is clear to the point that, "where a party enters into a contract, ignorant of a fact, but meaning to waive all inquiry into it, or waives an investigation after his attention has been called to it, he is not in mistake, in the legal sense." Houston & T. C. R. Co. v. McCarty, *supra*, 94 Tex. at 302, 60 S.W. at 431. Certainly, it can be said that, although ignorant of what would appear to be material facts (but which may not have been in light of the above discussion), Crateo waived all inquiry into them even though its attention had been called to the missing exhibits by language in the letter agreement.

Finally, in consonance with the general principle underlying *McCarty*, another Texas case stands for the proposition that the parties to a contract are chargeable with such knowledge that the exercise of ordinary diligence would have revealed, and that a contract may not be avoided on the ground of a mistake of fact where it appears that ignorance of the fact was the result of carelessness, indifference, or inattention. Ebberts v. Carpenter Production Co., Tex.Civ.App. 1953, 256 S.W.2d 601. Certainly, Crateo's lack of knowledge about what it now asserts to be material facts is attributable to its own lack of initiative and to its own indifference.

In sum, Crateo cannot now complain that it was ignorant of material facts going to the essence of its contract with Southern. Nor can it be excused for its failure to exercise ordinary diligence. Simply stated, the defense of "mistake of fact" is not available to one who conducts himself as did Crateo. We therefore conclude that the contract here at issue is valid and enforceable.

III. Release.

Wilbur Clark, one of the makers of the note, died on August 27, 1965. His

---

3. In a letter dated July 2, 1964, Ward stated to Crateo,

"It is our intention by January 1, 1965, to present you with written evidence that we have accomplished our goal of obtaining a first mortgage of Three Million, Three Hundred Thousand Dollars ($3,300,000.00), or a second lien to substitute for your commitment. * * * * Furthermore, in any event we guarantee you will not have to perform in respect to your commitment." (App. 38).

On this basis Moody presumed that Crateo would not have to perform. However, the district court found that Moody's expectation of not having to perform did not amount to fraud. Though Crateo assumed that there was little probability of its having to purchase the note, it would nevertheless have been willing to do so if the note-purchase agreement were enforceable and if demand were made.

domicile was in Nevada. On December 17, 1965, the statutory period for the filing of claims against the Nevada estate ended, and according to Nevada law any claim not filed within that time is "forever barred." Neither Southern nor Crateo filed a claim on the note against Clark's Nevada estate within the statutory period.

Crateo here contends that Southern's failure to file a timely claim in Nevada "released" Wilbur Clark in violation of the contractual provision forbidding release and thereby absolved Crateo of any duty to perform under the agreement. The applicable portion of the note-purchase agreement reads as follows:

"[Southern] further agrees that during the term of this agreement it will not release any of the makers of The Note nor release the lien of the Deed of Trust securing same, except to the extent that credits by [Southern] upon its loan evidenced by The Note and made as a result either of payments received thereon or ' of [Southern's] failure for any reason to advance the full sum of $600,000.00 upon The Note, may by operation of law constitute such a release or releases."

The district court found against Crateo, holding that no release had transpired. The primary thrust of the district court's view was that Crateo had as much right to file a claim in Nevada as did Southern since both claims were contingent, the note not being in default at the time of Clark's demise.

On the record before us there is no reason to presume that Crateo was unaware of Wilbur Clark's death. Nor does Crateo make that point on appeal. Had Crateo filed a claim, Wilbur Clark's Nevada estate would have been liable to undertake Clark's obligations under the note. The district court appropriately noted that the contract between Crateo and Southern contained a provision to the effect that Southern was under no duty to pursue a defaulting maker. Why, then, would Southern be required to file a contingent claim?

In finding that no release had occurred, the district court opined:

"In view of these contractual provisions and the facts and circumstances surrounding execution of the contract, I am persuaded that the failure to file a claim in the Nevada proceedings did not constitute a 'release' as that term was used in the note-purchase agreement * * *."

317 F.Supp. 1184.

We can find no fault in the lower court's conclusion. The key point is that Southern's failure to act in no way foreclosed Crateo from pursuing the estate of Wilbur Clark in Nevada. Since Crateo claims no lack of knowledge of the death, it was incumbent upon Crateo to protect its own interests by filing a contingent claim in Nevada. Crateo makes much of the fact that the note-purchase agreement did not entitle it to compel Southern to turn over the note. Nonetheless, Crateo was aware that Southern might make demand upon it to purchase the note and that, in such a circumstance, it would be forced to look to the makers of the note to satisfy the underlying obligation.

█ In light of the above discussion, we reach the conclusion that Southern's failure to file a claim against Clark's Nevada estate did not operate as a "release" so as to relieve Crateo of its responsibility to perform on the note-purchase agreement.

IV. Tender.

The note-purchase agreement contained a clause stating that Crateo would be obligated to purchase the note at Southern's request, "subject to fulfillment of the following conditions precedent on or prior to the Closing Date as hereinafter defined * * *." The "conditions precedent" were itemized as "tender or delivery" of various documents. The agreement further defined the "Closing Date" as

"that date specified by [Southern] in its request to [Crateo] to purchase The Note as the date which [Crateo]

shall be obligated to purchase The Note from [Southern], and pay [Southern] therefor, provided the conditions precedent to [Crateo's] obligation shall have been theretofore, *or shall contemporaneously therewith be,* satisfied and performed \* \* \*." (Emphasis supplied).

At Austin, Texas, on February 4, 1966, the actual closing date denominated by Southern, Crateo failed to appear. At trial Crateo contended that Southern's failure to seek it out and to produce the specified documents in its presence made Southern's "tender" ineffectual and permitted Crateo not to purchase the note. Southern countered, arguing that its tender by telephone and telegram sufficed.

Whether Southern's telephone and telegraphic messages satisfy the requirement of "tender" depends on the construction given the contractual provisions. If "tender or delivery" was a "condition precedent," the law requires an "absolute tender" by Southern. Failing such tender, liability to perform never attached to Crateo. Professor Williston defines an absolute tender as follows:

> "There must be an unconditional offer to perform, coupled with a manifested ability to carry out the offer, *and a production of the subject matter of the tender* \* \* \*."

6 Williston, The Law of Contracts § 1810 (Rev. ed. 1938) (emphasis supplied, footnote omitted). Clearly, Southern's "tender" does not rise to that level since the documents to be delivered were not placed in Crateo's presence. Accordingly, Crateo's point would be well taken that its liability to perform never materialized.

■ However, the district court, in construing the contract here at issue, determined that "tender or delivery" was not a condition precedent, but that Southern's duty to make tender or delivery and Crateo's duty to purchase the note were concurrent conditions. It is a well-settled principle that where concurrent conditions are concerned the strict rules of tender applicable to an ordinary condition precedent fall by the wayside. Where concurrent conditions are involved, "tender [means] only a readiness and willingness to perform, \* \* \* with present ability to do so, and [with] notice to the other party of such readiness." 6 Williston, The Law of Contracts § 833 (3d ed.).

The seminal inquiry, then, is whether the contract contemplated concurrent or precedent conditions. We find the district court's determination of that question to be correct—that the contract encompassed concurrent conditions. Actually, a concurrent condition is a hybrid form of a condition precedent. As Professor Williston has said:

> "The concurrency indicated by the phrase 'concurrent condition or conditions' is concurrency in time of the proposed or agreed performances of two mutual promisors, or of a promisor and promisee, not a concurrency of the performance of one with the liability of the other. If two persons are bound to give concurrently, one a book and the other the price, neither party will be liable until performance has either been made or tendered by the other. But though the tender may be absolute, it need be only conditional, that is, subject to receiving concurrent performance from the other side. The obligation of each party, therefore, is subject to the condition precedent to liability thereon of either performance, or absolute or conditional tender, by the other side. Concurrent conditions, then, do not differ from conditions precedent in the relation of time which the happening of the condition bears to the duty of immediate performance on the contract. They are, indeed, mutual conditions precedent."

5 Williston, The Law of Contracts § 666A (3d ed.) (footnotes omitted).

■ In Echols v. Miller, Tex.Civ.App. 1920, 218 S.W. 48, the Texas courts recognized the validity of "mutual conditions precedent." By the terms of the

contract itself "tender or delivery" by Southern could be performed simultaneously with payment by Crateo. These duties were "concurrent in time," to borrow a phrase from Williston. Put simply, the language in the contract can be read as establishing only concurrent conditions precedent.

One should particularly note the language in the provision defining "Closing Date." The district court found that the clause, "provided the conditions precedent * * * shall have been theretofore, or shall be contemporaneously therewith be, satisfied and performed" modified the phrase, "[Crateo] shall be obligated to purchase * * * and pay for" the note. That appears to be a logical reading of the contract. Such an interpretation does in fact establish concurrent conditions. Since Southern evinced that it was ready, willing and able to make an absolute tender, the law would not require that it actually do so. Its conditional tender was sufficient to fix Crateo's liability.

### V. Attorney's Fees.

Subsequent to the foreclosure of the hotel in Austin, Texas, several law suits and numerous legal expenses were incurred by Southern. As best can be determined from the record on appeal the law firm of Andrews, Kurth, Campbell & Jones billed Southern for nine items of expense incurred in Texas as a result of the foreclosure. Furthermore, various other law firms charged Southern for prosecution of a suit against the Estate of Wilbur Clark in Nevada.

Although the district judge's opinion is not wholly clear, attorneys' fees seem to have been awarded on the following basis: $36,875 for the fees charged Southern by Andrews, Kurth, Campbell & Jones, plus $6,143.40 for the fees charged Southern by various other law firms for services rendered in connection with the Nevada suit against the Estate of Wilbur Clark.

As a general principle it may be said that where a breach of contract has forced one of the contracting parties to maintain or to defend an action against a third person, he is entitled to recover, from the party breaching the contract, attorneys' fees and other expenses incurred in such litigation. 5 Corbin, Contracts § 1037 (1964 ed.); 25 C.J.S. Damages § 50e; Vaughan v. Atkinson, 4 Cir. 1961, 291 F.2d 813, rev'd on other grounds 369 U.S. 527, 82 S.Ct. 997, 8 L. Ed.2d 888; Chittim v. Texas Pacific Coal & Oil Co., 10 Cir. 1963, 317 F.2d 81. In the case at bar, we are bound by the *Erie* doctrine to apply the substantive law of the State of Texas. Though no Texas court has yet faced the question of third party litigation expenses as an element of damages in a breach of contract case, the court below noted that "the parties do not dispute the recoverability of the amounts claimed by [Southern] if such are properly established as damages." 317 F.Supp. at 1189.

Thus, three issues are presented with respect to the award of attorneys' fees in this case:

A. Whether a sufficient evidentiary basis existed to warrant the district judge's conclusion that both the attorneys' fees incurred in Texas and those incurred in Nevada were proximately caused by Crateo's breach;

B. Whether a sufficient evidentiary basis existed to warrant the district judge's conclusion that no allocation was necessary with respect to the incidents and suits giving rise to the fees charged Southern by Andrews, Kurth, Campbell & Jones; and

C. Assuming the district court could validly conclude that the suit against the Estate of Wilbur Clark in Nevada was proximately caused by Crateo's breach, whether a sufficient evidentiary basis existed to warrant the district judge's allocation of attorneys' fees where admittedly some of the monies billed to Southern were in connection with a suit arising out

of facts wholly unrelated to the transaction here under scrutiny.[4]

Although the burden is on the plaintiff to prove its damages, e. g., Bildon Farms, Inc. v. Ward County Water Improvement District No. 2, Tex. 1967, 415 S.W.2d 890, a showing of proximate cause need not rise to the level of proving that the defendant's breach was the sole cause of damage. E. g., Houston & T. C. R. Co. v. Maxwell, 1910, 61 Tex.Civ.App. 80, 128 S.W. 160. Yet, in the case *sub judice,* there was uncontroverted evidence which would carry even that weighty burden. Thus, on an examination of the record, we conclude that there was an adequate basis upon which the trial judge could award $36,-875. Being a question of fact, the determination of proximate cause by the district court should not be reversed absent a showing of clear error.

To the contrary, with regard to the award of $6,143.40 in attorneys' fees incurred by Southern in connection with litigation against the Estate of Wilbur Clark in Nevada, we think that the allocation was not justified. An award of that amount requires a two-step analysis. First, it must be shown that the litigation with the Clark Estate was proximately caused by Crateo's breach. Following the same line of reasoning as above, we find that Southern satisfied this aspect of its burden of proof.

However, unlike the award with respect to the $36,875 in attorneys' fees discussed above, a second element is here involved. It was admitted that Southern was billed a total of $13,041.41 in connection with litigation against the Clark Estate in Nevada. Furthermore, it was admitted that some part of that litigation was attributable to a cause of action wholly unrelated to Southern's claim

against Crateo. Specifically, the suit against Clark's Estate sought recovery on the deficiency which remained after the foreclosure on the Austin hotel ($285,000) and recovery on another and unrelated note left unpaid by Clark ($320,000). There was little if any testimony which would tend to show how to allocate the $13,041.41 in attorneys' fees there involved. Apparently the trial judge employed the following formula:

$$\frac{285,000}{285,000 \ + \ 320,000} \ \text{X} \ \$13,041.41 \ =$$

$6,143.40, the sum which was awarded as attorneys' fees in this case.

Granted, the one seeking attorneys' fees as an element of damage need introduce only the best evidence obtainable in order to prevail. Bildon Farms, Inc. v. Ward County Water Improvement District No. 2, Tex.1967, 415 S.W.2d 890, 896–897. Nonetheless, the record fails to support a finding that Southern introduced the best evidence it could with respect to the litigation in Nevada. In his testimony concerning the $36,875 award, one of Southern's attorneys noted that the most accurate way of determining the percentage of that sum attributable to each cause of action involved would be to look at the time sheets of the attorneys involved. Similarly that would seem to be the most appropriate method of allocating with respect to the fees charged for litigation against Clark's Nevada Estate. If no time records are available or if the Nevada suit presented only one legal issue despite that it comprised factually unrelated claims, then perhaps the most accurate method would be to allocate on the basis of the sums of money involved in the two distinct aspects of the suits. But, no such testimony was introduced. For that reason, the question

4. With respect to the Nevada litigation, Southern was charged $13,041.41 in attorneys' fees for litigation with the Estate of Wilbur Clark. The suit against that Estate sought recovery not only for the deficiency on Wilbur Clark's note for sums borrowed in connection with the funding of the hotel in Austin, Texas (the note which Crateo had agreed to "take over"), but also on another note for $320,-000 made by Wilbur Clark and payable to Southern. The $320,000 indebtedness had no relation to the suit here at bar, concerned an entirely separate and distinct financial transaction, and in no way involved Crateo.

of attorneys' fees awarded for litigation against Clark's Nevada estate is remanded for further proceedings to determine the proper method of allocation.

## CONCLUSION

In light of the above discussion, we affirm that part of the district court's judgment awarding Southern National Bank $236,875 ($200,000 in liquidated damages and $36,875 for attorneys' fees) plus interest from the date of Crateo's breach. The award of $6,143.40 in attorneys' fees for Southern's litigation with Wilbur Clark's Nevada estate is vacated, and the question of the proper allocation of the $13,041.40 in attorneys' fees billed Southern in connection with that litigation is remanded for further consideration by the district court.

Affirmed in part and in part vacated and remanded.

RIVES, Circuit Judge (dissenting):

Regretfully I find myself unable to concur. First, I am not persuaded that an enforceable contract existed between Southern and Crateo to the extent that Crateo was obligated to perform where the hotel was totally financed. Second, even if Crateo was obligated to perform in such circumstances, there has been no showing that Southern, though willing, was able to tender the required documents on February 4, 1966.

1. *The Contract.*

The majority follows the reasoning of the district court which it correctly states as follows:

"The district court reasoned that even assuming Moody never saw part of the agreement, he signed a document which included the following clause:

" '[Crateo] has heretofore examined, and hereby approves, the form of the instruments or documents attached hereto as exhibits and agrees that delivery to it of said instruments or documents in such form duly executed by the party or parties required by the form thereof to execute said instruments or documents shall satisfy any condition or conditions to its obligations hereunder which relate to the execution or delivery of such instruments or documents.'

"On the authority of that clause, the district judge held that 'a party who signs a contract intending to be bound but [who] fails to read it is obligated according to its terms * * *.' " 1

The rule binding one to an agreement which is presented to him but which he does not read has not been applied where the party against whom recovery is sought never saw part of the so-called agreement. It is a well-settled principle that a contract is unenforceable where material terms are omitted. The omissions here alleged cannot be cured, in my opinion, by reference to the general assurance which says merely that Crateo has "examined * * * the instruments or documents *attached hereto as exhibits* * * *." (Emphasis supplied.) In short, such a statement does not run to exhibits which were neither then nor in the future appropriately attached or made known to Crateo. Southern could not rely upon such a representation when it knew that Crateo had not seen the crucial attachments.

Nonetheless, the majority is willing to enforce the contract on a theory that Crateo waived the materiality of knowing that the hotel was totally financed. I agree that, by failing to inquire, Crateo to some extent waived the significance of the missing facts. *Cf.* Ebberts v. Carpenter Production Co., Tex.Civ. App.1953, 256 S.W.2d 601; Houston & T. C. R. Co. v. McCarty, 1901, 94 Tex. 298, 60 S.W. 429. Crateo agreed to be bound by all the terms included in the letter portion of the note-purchase agreement, which Moody actually did see, and in effect to be bound by the

---

1. Note that under that rule Crateo is "obligated according to its terms," that is the terms of the signed contract. I think that this case turns upon the true meaning of those terms.

facts disclosed in the missing attachments to the extent that they did not vary from the letter portion of the agreement. In determining which facts Crateo waived knowledge of, it therefore becomes important carefully to peruse the language of the letter which Moody saw and signed. Each of the missing exhibits was cursorily described in the letter portion of the agreement by a caption. The exhibits here important were the "Deed of Trust," certain "Plans and Specifications" for the proposed hotel, and a "Construction Loan Agreement."

By failing to inquire as to the particulars of each of those documents Crateo waived knowledge of its contents, but only to a limited extent. In essence, Crateo became bound by any facts or terms disclosed in each document which a reasonable man in Crateo's position could anticipate as within the scope of the exhibit as described in the letter. For example, Crateo was bound to accept any building which reasonably purported to be a "hotel." Whether the completed hotel conformed with the "Plans and Specifications" set out in that exhibit was waived by Crateo. Similarly, Crateo waived knowledge of the precise terms of the "Deed of Trust."

However, the terms of the "Construction Loan Agreement" are crucial and require, I think, a finding on the facts of this case that Moody's failure to inquire into its particulars did not bind Crateo to accept the terms of that exhibit. The letter portion of the note-purchase agreement which Moody signed did not in any manner disclose that, under the "Construction Loan Agreement," Southern would lend money not merely to pay the cost of building the hotel but also to cover the purchase price of the land and some $72,000 in commitment fees for both the interim and the permanent financing. To the contrary, at least one portion of the letter signed by Moody would indicate that land costs were not contemplated. In section (2)(e) of the letter, Southern particularized the nature of the construction expenses to be incurred. None of those expenses related to the cost of acquiring the land. In short, the letter agreement failed to disclose that the project was to be "totally financed"—that the borrowers were investing no capital. A reasonable man reading the phrase, "Construction Loan Agreement," along with the other provisions of the letter would not suspect that part of the loan in issue was to cover the land expenses and the commitment fees. Crateo waived precise knowledge of the specifics of the "Construction Loan Agreement" but not to such an extent that the agreement might transcend its description in the letter. Crateo's waiver did not establish silent acceptance of an agreement whereby the borrowers were to contribute nothing and the so-called construction loan was to cover not only the costs of construction but also the cost of the land and of some $72,000 in commitment fees ($33,000 to Southern itself to secure the interim financing plus $39,000 to the permanent lenders to secure the take-out agreements).

Crateo had every reason to believe that it would obtain a second lien both on a hotel, the construction costs of which amounted to $3,300,000, and on a piece of land of some value, although the actual value of the land was unknown to Crateo, and Crateo waived lack of such knowledge by its failure to make inquiry. In reality Crateo received a second lien on a building costing $2,628,000 and on a parcel of land costing $600,000.

It was Southern's duty to inform Crateo that the "Construction Loan Agreement" encompassed a loan for something other than that which would be implied by the plain meaning of its title construed in connection with all the terms of the letter contract. Admittedly, Southern did prepare a document which actually disclosed that the project was totally financed. However, Crateo never saw the document. Exhibit "C," the "Construction Loan Agreement," was sent to Blakeway and, we assume, it was Southern's expectation that Blakeway would channel it through Ward to Crateo. Neither Blakeway nor Ward was an

agent of Crateo such that delivery to either of them was tantamount to delivery to Crateo.[2] Thus Southern should bear the consequences of Crateo's failure actually to see the "Construction Loan Agreement." At trial two representatives of Crateo testified that at no time prior to the expiration of the note-purchase agreement had Crateo received a copy of the "Construction Loan Agreement." That testimony went unchallenged.

In sum, though to some extent Crateo waived knowledge of the specific terms of the missing attachments, that waiver did not encompass the terms of the "Construction Loan Agreement" actually drafted by Southern. Since Southern failed to apprise Crateo that the hotel was being totally funded and since this fact was obviously material to the risk assumed by Crateo in agreeing to accept a second mortgage as security, Crateo's contract did not obligate it to purchase the $600,000 note.

### 2. Tender.

I agree with the reasoning of the majority that if the contract required Crateo's purchase of the $600,000 note, tender and delivery of the specified documents by Southern was not a condition precedent. Since the contract embodied concurrent conditions rather than a strict condition precedent, Southern was obligated to show only that it was ready, willing and able to make tender. Southern's telephone and telegraphic messages to Crateo on the last day of the contract's term, February 4, 1966, evinced its willingness to make the necessary tender, but there was not, in my opinion, sufficient proof of Southern's *ability* to make the actual tender before the end of that day.

Thus, even if I could accept the majority's view that a valid, enforceable contract existed obligating Crateo to purchase the $600,000 note, I would vote to

remand the case to the district court for a finding as to Southern's ability to make the necessary tender prior to the expiration of the contract. Only if such ability existed could the contract be enforced.

In summary, while some contract existed between Southern and Crateo, the terms of that contract, reasonably construed in accordance with all of the then existing circumstances, did not obligate Crateo to purchase the $600,000 note. If that is correct, the judgment should be reversed with directions to enter judgment for Crateo. If the contract obligated Crateo to purchase the $600,000 note, then the case should be remanded for a finding as to Southern's ability to make the necessary tender before the contract expired.

I respectfully dissent.

2. The district court stated that if Ward was the agent of either Southern or Crateo, he was an agent of Crateo. It seems clear that Ward, and for that matter Blakeway, was not Crateo's agent. Rather, they were independent third parties— mere conduits.