**Leslie G. GILLIAM Plaintiff,**

v.

**GLOBAL LEAK DETECTION U.S.A., INC. Defendant.**

No. CIV. A. G–00–746.

United States District Court, S.D. Texas, Galveston Division.

May 9, 2001.

Thomas W. McQuage, Galveston, TX, for Leslie G. Gilliam, plaintiffs.

Scott Lyford, Mills Shirley et al., Galveston, TX, for Global Leak Detection USA, Incorporated, Global Heat Transfer Ltd., defendants.

## ORDER GRANTING DEFENDANT'S MOTION TO STAY

KENT, District Judge.

Plaintiff Leslie G. Gilliam brings this state law breach of contract action versus Defendant Global Leak Detection U.S.A., Inc. Now before the Court is Defendant's Motion to Stay Trial Pending Arbitration, filed March 23, 2001. For the reasons stated below, Defendant's Motion to Stay is **GRANTED**.

## I.  FACTUAL SUMMARY

This dispute grows out of a contract by which Plaintiff and Defendant agreed on the terms of a purchase and assignment of a technology Plaintiff had developed and patented. This technology involved a system for detecting leaks within sealed internal combustion engines and exhaust systems. The contract set forth the various substantive terms of the technology transfer, including warranties, royalty rights and other standard items seen in these types of agreements.

The final section of the Contract, Article X, referenced four separate schedules. Section 10.3 of Article X states that "The Dispute Resolution Provisions set out on Schedule 3 hereto shall apply to this Agreement." Schedule 3, attached to Defendant's Motion and properly authenticated by affidavit, contains an arbitration agreement. Defendant, asserting its Schedule 3 arbitration rights, has now moved for a stay of proceedings in the Court pending arbitration.

Plaintiff does not contest the coverage of the arbitration agreement, but instead maintains that Schedule 3 was not attached when the parties signed the Agreement. Therefore, according to Plaintiff, no arbitration agreement was in fact agreed to. Plaintiff submits his own affidavit, that of the attorney, Jack D. Ewing ("Ewing"), who was present representing the Plaintiff when the Agreement was signed, and an affidavit of Ewing's legal secretary who signed the Agreement as a witness. All three indicate in their affidavits that no Schedule 3 was attached at the signing.

Ewing's testimony, however, indicates that he had been "shown a proposed draft version of the [Schedule 3], [although] no such document was circulated between the parties at the time of the negotiation or execution of the documents." Ewing testifies that, knowing Defendant desired an

arbitration clause, he "assured[ed] [Defendant] that [Plaintiff] would not agree to such a provision at that time, although [Plaintiff] might be inclined to consider such a proposal at some future date."

Defendant's contract attorney, Neil Warren Nichols ("Nichols") presents a different version of what transpired. Nichols testifies that "[d]rafts of the Agreement and all Schedules had been provided to Jack Ewing prior to the [closing and signing] meeting." Nichols further states that "Schedule 3 ... was agreed to as drafted, but counsel Jack Ewing for the [P]laintiff and myself for the [D]efendant reached a mutual understanding that Mr. Ewing would be given a reasonable opportunity to propose [several discussed changes]. Mr Ewing thereafter proposed no changes in regard to either of these provisions."

## II.  ANALYSIS

At the outset, the Court observes that there is a strong federal policy favoring the arbitration process. *See Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 25, 111 S.Ct. 1647, 1651, 114 L.Ed.2d 26 (1991) (noting that the Federal Arbitration Act manifests a liberal federal policy favoring arbitration agreements); *Volt Info. Scis., Inc. v. Board of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 476, 109 S.Ct. 1248, 1254, 103 L.Ed.2d 488 (1989); *Life of Am. Ins. Co. v. Aetna Life Ins. Co.*, 744 F.2d 409, 412–13 (5th Cir. 1984). The Court, moreover, dutifully follows the four guiding principles established by the United States Supreme Court regarding arbitrability. First, and of crucial relevance to the matter now before the Court, "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *AT & T Techs., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 648, 106 S.Ct. 1415,

1418, 89 L.Ed.2d 648 (1986). Second, unless the parties "clearly and unmistakably provide otherwise, the question of [arbitrability] ... is to be decided by the court." *Id.* at 649, 106 S.Ct. at 1418. Third, in deciding arbitrability, "a court is not to rule on the potential merits of the underlying claims." *Id.* at 649, 106 S.Ct. at 1419. Fourth, "where the contract contains an arbitration clause, there is a presumption of arbitrability ... 'unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *Id.* at 650, 106 S.Ct. at 1419 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584–85, 80 S.Ct. 1347, 1353–54, 4 L.Ed.2d 1409 (1960)).

When confronted with the question of arbitrability, a District Court must determine, as a threshold matter, whether the grievance before it is subject to arbitration. *See Folse v. Richard Wolf Med. Instruments Corp.*, 56 F.3d 603, 605 (5th Cir.1995); *Oil, Chem. & Atomic Workers Int'l Union Local 4–227 v. Phillips 66 Co.*, 976 F.2d 277, 278 (5th Cir.1992). This determination mandates two specific inquiries. The Court first asks whether there is a valid agreement to arbitrate; if so, the Court then asks whether the dispute in question falls within the scope of the agreement. *See Webb v. Investacorp, Inc.*, 89 F.3d 252, 257–58 (5th Cir.1996). Ordinary state contract law will generally guide the Court in ruling on arbitrability. *See id.* at 258. However, while the Court applies state contract law, it will nevertheless give "'due regard ... to the federal policy favoring arbitration, and ambiguities as to the scope of the arbitration clause itself must be resolved in favor of arbitration.'" *Id.* (quoting *Volt Info. Sciences*, 489 U.S. at 475–76, 109 S.Ct. at 1253–54). Here, the Court need make only the first

of these two determinations, that is whether a valid agreement to arbitrate exists.[1]

■ In an effort to limit meritless claims of invalidity, the Fifth Circuit has held that a party seeking to avoid arbitration must bear the initial burden of production in order to create a fact issue on the validity of an arbitration clause. *See T & R Enters., Inc. v. Continental Grain Co.,* 613 F.2d 1272, 1278 (5th Cir.1980); *Dillard v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 961 F.2d 1148, 1154–55 (5th Cir.1992). Thus, Plaintiff must make " 'an unequivocal denial that the agreement had been made ... and some evidence should ... [be] produced to substantiate the denial.' " *T & R Enters.,* 613 F.2d at 1278 (quoting *Almacenes Fernandez S.A. v. Golodetz,* 148 F.2d 625, 628 (2d Cir.1945)).

■ In the present matter, Plaintiff has created several factual issues. None, however, are legally material for determining the existence of an agreement to arbitrate. By contrast, the undisputed facts indicate that Plaintiff and Defendant executed a contract. Sometime prior to signing the contract, the respective lawyers for both sides circulated an arbitration agreement. Thereafter, the parties' signed Agreement stated that "[t]he Dispute Resolution Provisions set out on Schedule 3 hereto shall apply to this Agreement." Schedule 3, clearly provides for binding arbitration. Plaintiff argues, however, that because Schedule 3 was not actually attached to the Agreement he signed, that no arbitration agreement was created.

■ Under Texas contract law, a party's failure to read an arbitration agreement does not excuse him from arbitration. *See EZ Pawn Corp. v. Mancias,* 934 S.W.2d 87, 90 (Tex.1996). The law presumes that a party "who has the opportu-

nity to read an arbitration agreement and signs it, knows its contents." *Id.; accord Barnett v. Network Solutions, Inc.,* 38 S.W.3d 200, 204 (Tex.App.—Eastland 2001, pet. denied) ("Parties to a written contract have the obligation to read what they sign; and, absent ... fraud ... they are not excused from the consequences attendant upon a failure to read the contract.").

In *Cantella & Co., Inc. v. Goodwin,* 924 S.W.2d 943, 944 (Tex.1996), the Texas Supreme Court applied this rule when the City of Lufkin sought to avoid arbitration. The City argued that it did not agree to arbitrate, because the assistant city manager who signed a contract "did not know about the arbitration provision." *Id.* The City based its contention upon the arbitration provision's " 'hidden' " placement on the back of the contract. *Id.* The court rejected the City's factual and legal arguments. First, the Court concluded that the arbitration provision was not hidden, but instead was captioned in bold and typed in all capital letters. *See id.* "Because of the document's nature, combined with the legal presumption that a party who signs a contract knows its contents, we reject the City's argument that it did not agree to arbitrate because it did not see the arbitration provision." *Id.*

The present case of course differs from *Cantella & Co.* because here Plaintiff contends not merely that he did not see the arbitration clause, but that it could not have been seen. However, based upon several other cases, the Court finds this to be a distinction without merit. The Agreement plainly states that "Dispute Resolution Provisions set out on Schedule 3 hereto shall apply." By setting forth that this Dispute Resolution Provision was attached, the parties agreed to its terms as though it

---

1. Plaintiff does not argue that his claims would not fall within the scope of the arbitra-

tion agreement if the agreement were otherwise valid.

were in fact attached. *Cf. Cook Chocolate Co. v. Salomon Inc.*, 684 F.Supp. 1177, 1182 (S.D.N.Y.1988) ("[W]here a contract expressly refers to another document, 'that other document ... is to be interpreted as part of the contract.' "). If Plaintiff had issues with Schedule 3, or if Schedule 3 was not attached, Plaintiff should have been advised by counsel to strike out the quoted provision. *Cf. Zenger–Miller v. Training Team, GmbH,* 757 F.Supp. 1062, 1068 (N.D.Cal.1991) ("Considering that the contracts were negotiated extensively, at arm's length, and with the aid of independent counsel, it is reasonable to hold [plaintiff] responsible for their failure to omit the clause."). Indisputably, Plaintiff "was on notice of the existence of important attachments, owing to the ... agreement's specific reference to the missing exhibits, and should have sought out their content." *Southern Nat'l Bank of Houston v. Crateo, Inc.*, 458 F.2d 688, 693 (5th Cir.1972). Having failed to do so, the Court finds that Plaintiff is bound by the arbitration clause contained in Schedule 3. *See Polyclad Laminates, Inc. v. VITS Maschinenbau,* 749 F.Supp. 342, 345 (D.N.H.1990) (citing *Southern Nat'l Bank,* 458 F.2d at 693 and rejecting the argument that a plaintiff could not be bound by an arbitration clause in a referenced document that the plaintiff had never seen).

### III. CONCLUSION

Plaintiff and Defendant engaged in arm's length negotiations, where both were represented by counsel. Those negotiations produced an Agreement that referenced an exhibit, the Schedule 3 arbitration agreement. Plaintiff now contends, however, that Schedule 3 was not attached to the Agreement when he signed it. However, the parties had previously discussed arbitration, and their Agreement made express reference to Schedule 3 as a "Dispute Resolution" provision. Plaintiff,

through his prior counsel, having failed to strike out the reference to Schedule 3, is now bound by its terms. Accordingly, Defendant's Motion to Stay Trial Pending Arbitration is **GRANTED.**

**IT IS SO ORDERED.**